## ALLIANCE PARTNERS, INC., ET AL. *v.* OXFORD HEALTH PLANS, INC.
### (SC 16903)

Sullivan, C. J., and Norcott, Katz, Vertefeuille and Zarella, Js.

Argued February 13—officially released April 22, 2003

---

*Eric D. Grayson*, for the appellants (plaintiffs).

*Kenneth W. Gage*, for the appellee (defendant).

*Opinion*

KATZ, J. The plaintiffs, Alliance Partners, Inc. (Alliance), and Carson Crane, Inc. (Carson), appeal[1] from the judgment of the trial court rendered in favor of the defendant, Oxford Health Plans, Inc. (Oxford). Carson, a real estate broker licensed in Connecticut and engaged in the business of providing advice and consultation to tenants seeking commercial real estate to lease, and Alliance, a company that was not licensed as a real estate broker in Connecticut but which also engaged in work similar to that of Carson, brought this action against Oxford, a health maintenance organization doing business in Connecticut, for money allegedly owed in connection with the plaintiffs' representation of Oxford when it leased certain real estate. Pursuant to Practice Book § 19-2A, the case was referred to an

---

[1] The plaintiffs appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

attorney trial referee who, after a trial, issued a report recommending judgment for Oxford. Thereafter, the report was accepted by the trial court, which rendered judgment thereon for Oxford. Although on appeal the plaintiffs raise several claims of trial court impropriety, the dispositive issue is whether the plaintiffs have presented this court with an adequate record for review of the judgment of the trial court rendered in accordance with the report issued by the attorney trial referee. We conclude that the plaintiffs have failed in this regard, and, accordingly, we affirm the judgment of the trial court.

The record discloses the following relevant facts and procedural history. In 1992, Oxford retained Carson and Alliance to locate office space in Norwalk. The parties agreed that Carson and Alliance would look to the owner of any property involved for a commission and they then would assign the commission to Oxford, which thereafter would remit 35 percent of the commission to Carson and 35 percent to Alliance. Thereafter, the plaintiffs located property in Norwalk that was owned by Prudential Insurance Company of America (Prudential). On June 24, 1993, Carson, Alliance, Oxford and Prudential signed a "Commission Agreement and Release Agreement" that set forth a base commission, and contained provisions for future renewals or extensions of the lease and options to expand the amount of space involved. Specifically, the agreement distinguished between the base commission and any prospective commissions that might arise from the extension of the Norwalk lease at its expiration or from the expansion of space occupied by Oxford during the term of the lease. According to the agreement, Oxford would compensate the plaintiffs "collectively in accordance with [a separate] [r]epresentation [a]greement[2] unless,

[2] The representation agreement, dated December 15, 1992, was not in evidence.

at the time [of] any such [r]enewal or [e]xpansion commission is payable, [Oxford] has employed another licensed real estate broker to represent [Oxford] in the transaction for which a [r]enewal or [e]xpansion [c]ommission is payable."

While that transaction was ongoing, Oxford began looking for "back office" space and retained Alliance and Carson in connection with this endeavor. Initially, Oxford signed a statement that Carson was representing it, but, thereafter, on February 3, 1993, Oxford entered into separate letter agreements with Alliance and Carson, confirming that both had been retained as Oxford's representative. Pursuant to the letters, Alliance and Carson agreed that they would "look to the owner, landlord or sublessee for our compensation. If [Oxford] pays any consulting fees, at the close of the transaction [Oxford] will receive those fees back plus a portion of the fee, as outlined in the attached agreement.[3] In addition, [Alliance and Carson] will bill [Oxford] for any travel expenses [in]curred during the transaction." On April 20, 1993, Oxford signed another letter stating that it had retained Alliance "exclusively" to represent its real estate interests in the search for the back office space.

In April, 1994, Oxford obtained office space in Nashua, New Hampshire, pursuant to a five year lease, which contained an option for Oxford to expand its space during the term of the lease, as well as an option to extend the lease for two additional five year periods.[4]

---

[3] The referenced attached fee agreement was not introduced into evidence. Nevertheless, the attorney trial referee before whom this action later was tried found that this fee agreement "was essentially the same" as the agreement concerning the Norwalk property, "contemplating that Oxford would receive a commission from the landlord and then share it with Alliance or Carson."

[4] The report by the attorney trial referee contained the following description of the New Hampshire lease: "The lease contained an option for Oxford to lease addition[al] space ('expansions') in seven 'phases.' The option for the first phase was to be exercised not later than January 1, 1995, and the

According to the lease, and consistent with the letter of April 20, 1993, Alliance was "the sole and only broker" with whom Oxford had dealt.[5]

In the fall of 1994, Oxford decided to handle its real estate needs in-house and attempted to "buy out" Carson and Alliance from any obligations remaining with respect to the Nashua and Norwalk leases. In a letter dated December 20, 1994, Oxford acknowledged that, although the landlord had not paid a commission on the Nashua lease, Oxford owed Alliance for expansion space already taken in New Hampshire. Oxford calculated the commission due on the basis of 4 percent of the rent it had paid.[6] Oxford agreed to pay Carson, but only in connection with the Norwalk property.

Thereafter, Alliance and Carson brought an action for breach of contract and unjust enrichment against

option to exercise the option as to the other phases was to 'be similarly exercised on January 1 of each successive year from January 1, 1996, through January 1, 2001, respectively.' The lease provided that 'Tenant and Landlord each represent, warrant and confirm that [Alliance] (the 'Broker') *is the sole and only broker* with whom it has dealt with respect to the lease of the Premises.' . . . There was an option to renew the lease for two additional five-year periods ('extensions'), the first in 1999, and the second in 2004. There is no indication that the New Hampshire landlord ever paid a commission to Oxford, as had been the case in the Norwalk transaction." (Emphasis in original.)

[5] Alliance and Carson claimed that Oxford orally had agreed to change the prior arrangement and to advance Carson a retainer, to pay its expenses, and, in the event a lease were signed, to pay Carson a fee of 4 percent of the annual rent from the base lease, 4 percent of the rent each time Oxford expanded its leased space, and 4 percent of the rent each time Oxford extended the lease. The attorney trial referee rejected that claim, finding the testimony "vague, confused and confusing, and not credible. . . . The New Hampshire lease makes crystal clear that Alliance was the sole broker on that transaction."

[6] There were four amendments to the New Hampshire lease involving expansions of space between April, 1994, and August, 1996. On April 19, 1999, Oxford signed a five year extension of the New Hampshire lease. It was undisputed that Alliance took no part in that transaction and that the brokerage firm of Cushman and Wakefield negotiated the extension on Oxford's behalf and billed Oxford in excess of $250,000 for its work.

Oxford for "fees/commissions" they allegedly were owed in connection with certain expansions and extensions of the lease for the property in Nashua.[7] By consent of the parties, the case was tried before an attorney trial referee. Prior to proceedings on the matter, Oxford filed a motion in limine to exclude, inter alia, any evidence of an offer to compromise. The referee ruled on the motion during the proceedings, concluding that a letter dated October 5, 1994, from Robert M. Smoler, Oxford's executive vice president of operations, to Joseph V. DiScala, Carson's managing partner, was inadmissible as an offer of compromise.

Thereafter, the attorney trial referee issued his report, concluding that, although the property in issue was located in New Hampshire, Connecticut law governed the transactions. The referee further concluded that the plaintiffs had failed to establish their claims under the applicable law. In support of this conclusion, the referee made a series of factual findings. He first found that Alliance and Carson had not submitted evidence "of the hours spent working on [Oxford's] behalf, or of the value of [their] services," concluding that, "[t]he only proof of damages was in the nature of real estate brokers' commissions."[8] The referee then found that, under the terms of the contract, only Alliance was entitled to recover and that such recovery "would be solely for real estate commissions earned on the original lease

---

[7] The plaintiffs' complaint initially alleged counts against Oxford in connection with the lease for the Norwalk property as well. The plaintiffs withdrew those counts at trial.

[8] According to the report by the attorney trial referee, Alliance and Carson claimed that "during the initial term of the lease and between September, 1995, and June 5, 1997, Oxford's rent was $1,114,120, and they were entitled to a 4 [percent] *commission* totaling $44,564. During the initial term of the lease and between June 6, 1997, and June 5, 1998, Oxford's rent was $1,566,313, 4 [percent] of which was $62,652. For the period between June 6, 1998, and June 5, 1999, [the] plaintiffs claim an unpaid *commission* of $93,073. Alliance was not paid these *commissions*." (Emphasis added.)

and certain expansions under the original lease. It is not entitled to compensation for extensions, specifically the 1999 extension, which it concedes it did not negotiate. . . . There was no contract with Carson as a matter of fact, and therefore it has no contract cause of action."[9] The attorney trial referee further found "as a matter of fact that Alliance did all of the relevant work, and that as a result, Carson factually has no unjust enrichment claim."

The attorney trial referee also concluded that Alliance was barred from recovery by General Statutes (Rev. to 1991) § 20-325a,[10] because it had failed to prove that it

---

[9] Specifically, the attorney trial referee found that only Alliance was part of the agreement and that Carson "was a stranger to the New Hampshire transaction." Additionally, he limited recovery by Alliance by finding that "[t]he provision of the Norwalk contract barring Alliance from recovery where Oxford retained another broker to do the work was an integral part of the New Hampshire agreement. There was no agreement to pay Alliance for later extensions negotiated by another broker. The assertion that Oxford, (a) having obtained the right in the June 16, 1993 Norwalk agreement to retain another broker and be relieved of obligations to [the] plaintiffs thereafter, would (b) in 1994 essentially waive that right and agree to pay Carson 'no matter what' in New Hampshire, and (c) then turn around and in the face of that liability hire another broker and pay it a substantial fee, is (d) just not credible."

[10] General Statutes (Rev. to 1991) § 20-325a provides in relevant part: "(a) No person who is not licensed under the provisions of this chapter, and who was not so licensed at the time he performed the acts or rendered the services for which recovery is sought, shall commence or bring any action in any court of this state, after October 1, 1971, to recover any commission, compensation or other payment in respect of any act done or service rendered by him, the doing or rendering of which is prohibited under the provisions of this chapter except by persons duly licensed under this chapter.

"(b) No person, licensed under the provisions of this chapter, shall commence or bring any action in respect of any acts done or services rendered after October 1, 1971, as set forth in subsection (a), unless such acts or services were rendered pursuant to a contract or authorization from the person for whom such acts were done or services rendered. To satisfy the requirements of this subsection any such contract or authorization shall (1) be in writing, (2) contain the names and addresses of all the parties thereto, (3) show the date on which such contract was entered into or such authorization given, (4) contain the conditions of such contract or authorization and (5) be signed by the owner or an agent authorized to act on behalf of the

was a licensed real estate broker. See *McCutcheon & Burr, Inc.* v. *Berman*, 218 Conn. 512, 520, 590 A.2d 438 (1991) (requirements of § 20-325a [b] are mandatory rather than permissive and statute is to be strictly construed). The referee further concluded that Alliance could not "circumvent the statutory plan and recover on an unjust enrichment theory. To allow recovery on . . . the [plaintiffs'] legal theories in the present case would nullify § 20-325a and emasculate the state's real estate licensing system. . . . Once again, I find as a matter of fact that Alliance did all of the relevant work, and that as a result, Carson factually has no unjust enrichment claim. . . . I believe that [§] 20-325a bars recovery in quantum meruit to the extent [that the] plaintiffs seek damages for what are essentially real estate broker activities. Secondly, in assessing the equity of [the] plaintiffs' claim, it is well to remember that Oxford has already paid [the] plaintiffs over $700,000 on these transactions. A claim that it has been unjustly enriched in light of that amount of money rings hollow. . . . [T]o the extent [the] plaintiffs seek commissions for the extension in June, 1999, it is clear all the work was done by [the brokerage firm of] Cushman and Wakefield, and that Alliance conveyed no benefit on [Oxford]." (Citations omitted; internal quotation marks omitted.) See footnote 6 of this opinion. Finally, with regard to nonbrokerage services, such as investigating the out-of-state location, the referee found that "Alliance totally failed to submit any proof from which a trier of fact could determine the value of those services. . . . Here there was no evidence at all. There were no

owner only by a written document executed in the manner provided for conveyances in section 47-5, and by the real estate broker or his authorized agent . . . ."

Since 1992, the time at which the initial agreement in this case was executed, the statute has been amended several times. The changes effected by those amendments, however, are not relevant to this appeal. Accordingly, for purposes of clarity, references herein to § 20-325a are to the 1991 revision.

records of hours of work performed, no estimate of reasonable hourly rates, and no proof of the value [of] the services to Oxford. To assign any value based upon this record would be pure speculation, and impermissible." (Citation omitted.)

Following the report by the attorney trial referee, the parties filed objections with the trial court. Thereafter, the trial court issued a memorandum of decision, summarily stating that "[h]aving reviewed the attorney trial referee's report as well as the posttrial memoranda of counsel, the court sustains the decision of the referee in favor of [Oxford]." The plaintiffs moved for reconsideration, which the trial court granted. The court entertained oral argument on the motion and thereafter issued a second decision, "declin[ing] to vacate the previous order accepting the [referee's] report." This appeal followed.

On appeal, the plaintiffs claim that the trial court improperly rendered judgment in accordance with the attorney trial referee's report because the referee improperly had: (1) found that they were precluded from recovery for failure to comply with § 20-325a; (2) excluded from evidence the letter from Oxford's executive vice president as an offer to compromise the dispute; and (3) determined that the plaintiffs could not recover based on the equitable principles of unjust enrichment and quantum meruit because they had not proven that Oxford had received any services for which it had not paid. As part of their challenge, the plaintiffs claim that the trial court improperly accepted the referee's factual findings and failed to make independent factual findings from its review of the record.

In addition to defending, on the merits, the judgment of the trial court predicated on the attorney trial referee's findings, Oxford contends that the plaintiffs have not provided this court with an adequate record for

review because, in the absence of a motion for articulation pursuant to Practice Book § 66-5 or a motion for review pursuant to Practice Book § 66-7,[11] we can only speculate as to the basis for the court's judgment. We agree with Oxford's procedural claim and therefore affirm the judgment.[12]

The law regarding the role of the attorney trial referee is well settled. When the parties consent, a case may be referred to a referee. Practice Book § 19-2A. "The report of . . . [an] attorney trial referee shall state . . . the facts found and the conclusions drawn therefrom." Practice Book § 19-8 (a). Unless the court concludes that the referee materially has erred in its rulings or that there are other sufficient reasons to not accept the report, "[t]he court shall render such judgment as

[11] Practice Book § 66-5 provides in relevant part: "Motion for Rectification; Motion for Articulation

"A motion seeking corrections in the transcript or the trial court record or seeking an articulation or further articulation of the decision of the trial court shall be called a motion for rectification or a motion for articulation, whichever is applicable. Any motion filed pursuant to this section shall state with particularity the relief sought. . . . The trial court may make such corrections or additions as are necessary for the proper presentation of the issues raised or for the proper presentation of questions reserved. The trial judge shall file the decision on the motion with the appellate clerk. . . ."

Practice Book § 66-7 provides: "Motion for Review of Motion for Rectification of Appeal or Articulation

"Any party aggrieved by the action of the trial judge as regards rectification of the appeal or articulation under Section 66-5 may, within ten days of the issuance of notice of the order sought to be reviewed, make a written motion for review to the court, to be filed with the appellate clerk, and the court may, upon such a motion, direct any action it deems proper. If the motion depends upon a transcript of evidence or proceedings taken by a court reporter, the procedure set forth in Section 66-6 shall be followed. Corrections which the court makes or orders made pursuant hereto shall be included in the prepared record in the same way in which, under Section 66-5, corrections made by the trial judge are included."

[12] The plaintiffs contend that we should not consider the procedural claim because Oxford failed to raise it in its counterstatement of issues or in a motion to dismiss. We disagree. First, Oxford did note this argument in its counterstatement of issues. Second, the success of Oxford's claim does not result in a judgment of dismissal.

the law requires upon the facts in the report." Practice Book § 19-17 (a).[13]

"While the reports of [attorney trial referees] in such cases are essentially of an advisory nature, it has not been the practice to disturb their findings when they are properly based upon evidence, in the absence of errors of law, and the parties have no right to demand that the court shall redetermine the fact[s] thus found. . . .

"A reviewing authority may not substitute its findings for those of the trier of the facts. This principle applies no matter whether the reviewing authority is the Supreme Court . . . the Appellate Court . . . or the Superior Court reviewing the findings of . . . attorney trial referees. . . . This court has articulated that attorney trial referees and factfinders share the same function . . . whose determination of the facts is reviewable in accordance with well established procedures prior to the rendition of judgment by the court. . . .

"Although it is true that when the trial court reviews the attorney trial referee's report the trial court may not retry the case and pass on the credibility of the witnesses, the trial court must review the referee's entire report to determine whether the recommendations contained in it are supported by findings of fact in the report." (Citations omitted; internal quotation

---

[13] Practice Book § 19-17 provides: "Function of the Court

"(a) The court shall render such judgment as the law requires upon the facts in the report. If the court finds that the committee or attorney trial referee has materially erred in its rulings or that there are other sufficient reasons why the report should not be accepted, the court shall reject the report and refer the matter to the same or another committee or attorney trial referee, as the case may be, for a new trial or revoke the reference and leave the case to be disposed of in court.

"(b) The court may correct a report at any time before judgment upon the written stipulation of the parties or it may upon its own motion add a fact which is admitted or undisputed or strike out a fact improperly found."

marks omitted.) *Killion* v. *Davis*, 257 Conn. 98, 102, 776 A.2d 456 (2001).

Finally, we note that, because the attorney trial referee does not have the powers of a court and is simply a fact finder, "[a]ny legal conclusions reached by an attorney trial referee have no conclusive effect. . . . The reviewing court is the effective arbiter of the law and the legal opinions of [an attorney trial referee], like those of the parties, though they may be helpful, carry no weight not justified by their soundness as viewed by the court that renders judgment." (Citation omitted; internal quotation marks omitted.) *State Bank of Westchester* v. *New Dimension Homes of Connecticut, Inc.*, 38 Conn. App. 491, 497, 661 A.2d 119 (1995). "Where legal conclusions are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts found by the . . . referee." (Internal quotation marks omitted.) *Villano* v. *Polimeni*, 54 Conn. App. 744, 747–48, 737 A.2d 950, cert. denied, 251 Conn. 908, 739 A.2d 264 (1999).

With these legal precepts in mind, we now turn to Oxford's claim that the plaintiffs failed to preserve their claims. Our law in this regard also is well settled. We have stated on numerous occasions that "[i]t is the appellant's burden to provide an adequate record for review. Practice Book § 60-5; *Barnes* v. *Barnes*, 190 Conn. 491, 494, 460 A.2d 1302 (1983). It is, therefore, the responsibility of the appellant to move for an articulation or rectification of the record where the trial court has failed to state the basis of a decision; *Gerber & Hurley, Inc.* v. *CCC Corp.*, 36 Conn. App. 539, 543, 651 A.2d 1302 (1995); to clarify the legal basis of a ruling; *Leverty & Hurley Co.* v. *Commissioner of Transportation*, 192 Conn. 377, 379, 471 A.2d 958 (1984); or to ask the trial judge to rule on an overlooked matter. *Wolk* v. *Wolk*, 191 Conn. 328, 335 n.1, 464 A.2d 780 (1983). In the absence of any such attempts, we decline to review

[the] issue." *Rivera* v. *Double A Transportation, Inc.*, 248 Conn. 21, 33–34, 727 A.2d 204 (1999).

In the present case, it is unclear from the trial court's memorandum of decision whether it ruled based on the facts found or the legal conclusions drawn therefrom, which, although not binding, nevertheless factored into the attorney trial referee's report. For example, the court did not expressly determine whether the referee properly concluded that: the New Hampshire agreement was essentially the same as the agreement pertaining to the Norwalk property with regard to Oxford's ability to retain another broker for purposes of any extensions; under applicable law, Carson and Alliance had not acted as joint venture partners in connection with the New Hampshire property;[14] the plaintiffs had not been retained as tenant consultants, but, rather, as brokers, who could recover only for their commissions pursuant to § 20-325a. Similarly, we have no ability to ascertain whether the trial court agreed with the referee's evidentiary ruling regarding Smoler's letter on Oxford's behalf. Specifically, we cannot determine whether the court decided that the item was indeed a letter of compromise that should not have been admitted, or whether the court disagreed with the referee's finding but concluded that the omission of the letter was harmless. Moreover, we cannot ascertain whether the trial court concluded that the plaintiffs' failure to comply with § 20-325a precluded them from obtaining equitable relief as a matter of law, or whether the trial court decided those claims based on the evidence or lack thereof noted by the referee. The trial court's memorandum of decision provides only that, having reviewed the referee's report and the parties'

---

[14] Although the attorney trial referee did not expressly find in his report that the plaintiffs were not acting as joint venture partners, a theory offered by the plaintiffs, his conclusion that Carson could not recover for work performed by Alliance necessarily is predicated implicitly on such a finding.

posttrial memoranda, "the court sustains the decision of the referee . . . ." The judgment file also is not instructive, as it merely provides: "The court, having heard the parties, finds the issues for [Oxford]."

It is well settled that "[a]n articulation is appropriate where the trial court's decision contains some ambiguity or deficiency reasonably susceptible of clarification. . . . [P]roper utilization of the motion for articulation serves to dispel any . . . ambiguity by clarifying the factual and legal basis upon which the trial court rendered its decision, thereby sharpening the issues on appeal." (Citations omitted; internal quotation marks omitted.) *Miller* v. *Kirshner*, 225 Conn. 185, 208, 621 A.2d 1326 (1993). The plaintiffs' failure to seek an articulation of the trial court's decision to clarify the aforementioned issues and to preserve them properly for appeal leaves this court without the ability to engage in a meaningful review.

The judgment is affirmed.

In this opinion the other justices concurred.