### BEVERLY L. GRIMM v. ROBERT L. GRIMM
### (SC 17212)
### (SC 17213)

Borden, Norcott, Katz, Palmer and Vertefeuille, Js.

Argued September 22—officially released December 13, 2005

*Thomas Puccio*, pro hac vice, with whom were *John Wayne Fox* and, on the brief, *Patricia M. Gaug*, for the appellant in Docket No. SC 17212, appellee in Docket No. SC 17213 (defendant).

*Norman A. Roberts II*, with whom, on the brief, was *Gaetano Ferro*, for the appellee in Docket No. SC 17212, appellant in Docket No. SC 17213 (plaintiff).

*Opinion*

NORCOTT, J. In this case, we confront procedurally dysfunctional matrimonial litigation as both parties appeal from the judgment of the Appellate Court in *Grimm* v. *Grimm*, 82 Conn. App. 41, 844 A.2d 855 (2004). The defendant, Robert L. Grimm, appeals, following our grant of his petition for certification,[1] from the judgment of the Appellate Court affirming the trial court's financial orders in favor of the plaintiff, Beverly L. Grimm. The plaintiff also appeals, following our grant of her conditional cross petition for certification,[2] from the judgment of the Appellate Court reversing the trial court's award to her of attorney's fees. We affirm the judgment of the Appellate Court with respect to the financial orders, albeit on the alternate grounds that the record was inadequate for appellate review and the defendant's claim was abandoned because of inadequate briefing. We reverse the judgment of the Appellate Court with respect to the counsel fee award because that award was not an abuse of the trial court's discretion.

---

[1] We granted the defendant's petition for certification to appeal limited to the following issue: "Did the Appellate Court properly conclude that the trial court's improper findings in support of its financial award were harmless?" *Grimm* v. *Grimm*, 270 Conn. 902, 903, 853 A.2d 519 (2004).

[2] We granted the plaintiff's conditional cross petition for certification to appeal limited to the following issue: "Did the Appellate Court improperly reverse the trial court's award of counsel fees?" *Grimm* v. *Grimm*, 270 Conn. 903, 853 A.2d 519 (2004).

The Appellate Court decision in this case reveals the following background facts and procedural history. "The parties first separated in 1988, and the plaintiff . . . commenced divorce proceedings in Ohio. The plaintiff subsequently withdrew the action after the defendant's repeated attempts to prolong the litigation by failing to appear or to plead except to contest the plaintiff's claim of irreconcilable differences. The plaintiff subsequently brought an action for dissolution of the marriage on the ground that she had lived separately and apart from the defendant for more than one year. She withdrew that action after the parties briefly resumed cohabitation. In 1992, the plaintiff brought another divorce proceeding. She withdrew that action after the defendant obtained employment in Connecticut where she was residing. In 1997, the plaintiff brought a divorce proceeding in the judicial district of Stamford-Norwalk, which she subsequently withdrew when she commenced the present action in Danbury seeking dissolution of her marriage on the ground of irretrievable breakdown. The defendant filed a motion to dismiss the action, or, in the alternative, to transfer the action to the judicial district of Stamford-Norwalk, arguing that the filing of the present action constituted forum shopping because the plaintiff had originally commenced a dissolution action in Stamford and later withdrew the action. The court denied the defendant's motion.

"Documentary and testimonial evidence were presented to the court on approximately sixteen trial dates from May 22 to July 9, 2002. In January, 2003, the court dissolved the parties' marriage[3] and entered various

[3] The trial court found that the record demonstrates that the defendant had "spent an extraordinary amount of time and effort" attempting to prove that there was no marriage to dissolve, and alternatively, that the marriage had not broken down irretrievably. The trial court concluded, however, that the parties' marriage had broken down irretrievably without any hope of reconciliation. The trial court relied on the plaintiff's testimony about the defendant's behaviors that she had found objectionable, which included:

financial orders. The court ordered that the defendant (1) convey his interest in the parties' marital residence located in New Canaan to the plaintiff, (2) pay the plaintiff lump sum alimony in the amount of $100,000, and (3) pay the plaintiff $100,000 in attorney's fees." Id., 43–44.

The defendant, raising a plethora of claims,[4] appealed from the judgment of the trial court to the Appellate Court. With respect to the issues that are the subject of these certified appeals, the Appellate Court concluded that the trial court had: (1) in fashioning the financial orders, improperly determined that the defendant had diminished the marital estate by $2.9 million, but that incorrect finding was harmless error; and (2) abused its discretion by ordering the defendant to pay $100,000 of the plaintiff's attorney's fees. Id., 53–54. These certified appeals followed. See footnotes 1 and 2 of this opinion.

(1) watching pornography over her objection; (2) making inappropriate and unwanted sexual advances toward her; (3) walking around naked in the presence of her adolescent daughter; (4) disappearing for days at a time without telling the plaintiff of his whereabouts—at one point leaving her stranded in an airport; and (5) punishing the plaintiff's daughter in ways that, while not abusive per se, most charitably can be described as unconventional.

The record did, however, also demonstrate that charity was a priority for both parties. The defendant routinely gave more than $100,000 annually to various religious charities—donations that did not stop even during the pendency of these costly proceedings. For her part, the plaintiff made donations of nearly $4000 per month to Inspiration Ministries, which is a church of seven members that meets in her home and was founded by her friend, the Reverend Alan Fretto, a retired police officer.

[4] The defendant raised the following claims in the Appellate Court: "(1) General Statutes § 46b-40 (c) (1) violates the free exercise of religion clauses of the federal and state constitutions, (2) the trial court improperly concluded that the parties' marriage had irretrievably broken down and precluded expert testimony on the subject, (3) the court improperly determined the financial orders, (4) the court improperly denied his motion to open the evidence prior to judgment for the purpose of offering certain evidence and (5) the court improperly denied his motion to dismiss or to transfer the matter to another judicial district." *Grimm* v. *Grimm*, supra, 82 Conn. App. 43.

## I

We begin with the defendant's claim that the Appellate Court improperly concluded that the trial court's determination that he had diminished the marital estate by $2.9 million was incorrect, but harmless error not requiring reversal. We affirm the judgment of the Appellate Court, but on the alternate grounds that the defendant's claims with respect to the $2.9 million were both abandoned and rendered unreviewable by his failure to follow certain basic principles of appellate procedure.[5]

The record and the Appellate Court decision reveal the following additional facts and procedural history relevant to this claim. The trial court credited the evidence presented by the plaintiff at trial and found that, while the action was pending in Danbury from 2000 until 2002, "the defendant spent large sums of money for personal expenses (approximately $400,000 per year) while making no meaningful effort to obtain employment commensurate with his education, work history and skills. This testimony [permitted] the court to find that in the years from 1998 to 2002, the defendant earned approximately $311,000 and the marital assets were reduced by approximately $2.9 million. This was the result of the defendant's liquidation of retirement funds and his expenditure of approximately $700,000 for charities and an additional $1.1 million for counsel fees in conjunction with the dissolution proceedings. It was not possible to make a more specific finding regarding his financial transactions because of his failure to comply with certain discovery requests."

---

[5] We note that the plaintiff timely filed, pursuant to Practice Book § 84-11, a statement of alternate grounds for affirmance of the trial court judgment, namely: (1) "the trial court did not make improper findings in support of its financial award"; and (2) "the defendant's claim regarding the trial court's 'improper findings' in support of its financial awards was not briefed by him at the Appellate Court level and should therefore be deemed abandoned."

The trial court then made additional findings, including the following: (1) "the amount of attorney's fees, even in a case involving sizeable assets, is excessive in light of the lack of complex issues"; and (2) "the extent of the charitable gifts paid out by the defendant at a time when there are automatic orders preventing wholesale reductions in the marital assets is inexcusable." The trial court further noted that, although "the downturn in the stock market resulted in the shrinkage of the parties' assets," that diminution did "not include the sale or transfer of approximately 40,600 shares of [General Electric] stock without permission of the court and without the knowledge and consent of the plaintiff." The trial court then concluded that "the defendant has failed to earn income commensurate with his skill and talent and, in addition, he has seriously and inexcusably diminished the asset picture of the parties," while "[t]he plaintiff, on the other hand, has made no appreciable reduction in the marital assets and has made sizeable contributions to those funds."

The trial court then found that the marriage had broken down irretrievably, and rendered financial orders directing the defendant to convey to the plaintiff all of his right, title and interest in the marital residence in New Canaan, and directing the plaintiff to convey to the defendant all of her right, title and interest in the marital home that was located in Highland Heights, Ohio. The trial court allowed the plaintiff to retain her rights to her home in Bethel. The court also made certain orders with respect to the disposition of personal property, including several automobiles, and various brokerage accounts. As stated previously, the court directed the defendant to pay the plaintiff lump sum alimony in the amount of $100,000, and a $100,000 contribution to her counsel fees.

On appeal, the Appellate Court concluded that, although the trial court had weighed the proper statu-

tory factors in arriving at the award; see General Statutes §§ 46b-81 (c) and 46b-82 (parties' age, health, employment, education, earnings and earning capacities, as well as reasons for dissolution); its finding that the "defendant wrongfully had diminished the marital assets by approximately $2.9 million," as calculated by "his liquidation of retirement funds in the amount of $1,121,737, his expenditure of $717,865 in charitable contributions and his expenditure of more than $1,130,000 in counsel fees," was improper. *Grimm* v. *Grimm*, supra, 82 Conn. App. 51. Specifically, the Appellate Court disagreed with the trial court's determination, noting that, with respect to the charitable contributions, the automatic orders did not come into effect until December 15, 2000, and that only "charitable contributions during the years 2001 and 2002 in the amount of $286,000 violated the orders because the automatic orders were in effect."[6] Id., 52.

The Appellate Court further noted that, although the trial court's calculation "improperly included a portion of the charitable contributions and the retirement funds in the amount that it determined was the defendant's wrongful reduction of the marital assets,"[7] that calcula-

[6] The Appellate Court stated that the "donations that were made in 1998 in the amount of $149,525 were specifically authorized by an earlier order from the Stamford case when the automatic orders in this case were not in effect. The earlier order permitted the defendant to make charitable contributions as long as they did not exceed $200,000 annually. The $149,525 contribution, which was made while the defendant was employed, did not diminish the marital assets of both parties. Accordingly, the court should not have included that amount in determining the amount by which the defendant had reduced or dissipated the marital assets." *Grimm* v. *Grimm*, supra, 82 Conn. App. 52.

[7] The Appellate Court concluded that the trial court incorrectly had "adopted the plaintiff's argument that the defendant had diminished the marital assets by approximately $2.9 million. That amount was determined by taking the total of the liquidated retirement funds, the charitable contributions and [the] defendant's counsel fees. It was incorrect to total those categories because a portion of the liquidated retirement funds was used in part to make charitable contributions. By the court's reasoning, in effect, any of the liquidated retirement funds that were used for charitable contribu-

tion also "did not fully take into account the 40,635 shares of General Electric stock that he had sold or given away. That factor would offset, to a degree, any amount by which the court improperly determined that the defendant had diminished the marital assets. In determining the impact of the incorrect findings, it is significant that the court's finding was not directly linked to any specific property distribution that was ordered by the court. We note further that the defendant should not be entitled to benefit from the ambiguity that he created by his refusal to provide clear and accurate financial records." Id., 53. Accordingly, the Appellate Court concluded that the trial court's "findings as to the specific amount of the marital assets that the defendant wrongfully dissipated and the method by which he did so constituted harmless error that did not undermine the financial orders."[8] Id.

We begin with the proper standards of review. "The scope of our appellate review depends upon the proper characterization of the rulings made by the trial court. To the extent that the trial court has made findings of fact, our review is limited to deciding whether such

tions would have been counted twice. On the basis of the record, the court's determination of the amount of assets that were dissipated by the defendant may have been as much as $500,000 too high. As the court noted, however, the total amount of the retirement funds included in the contributions was indeterminable because the defendant refused to comply with several discovery requests to provide clear and accurate financial records." *Grimm* v. *Grimm*, supra, 82 Conn. App. 52–53.

[8] Judge Flynn dissented from this portion of the Appellate Court decision. Although he agreed that the trial court's factual finding with respect to the reduction of assets was inaccurate, he disagreed with the majority's conclusion that the trial court's failure to consider fully the 40,635 shares of General Electric stock rendered that inaccuracy harmless error. See *Grimm* v. *Grimm*, supra, 82 Conn. App. 56–57 (*Flynn, J.*, dissenting). Judge Flynn concluded that the inaccuracy necessarily required a new hearing because it was not severable from the " 'carefully crafted mosaic' "; id., 57; and "the erroneous calculation of the amount of marital assets that the defendant was alleged to have dissipated was not severable and was most definitely linked to other factors." Id., 58 (*Flynn, J.*, dissenting).

findings were clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Citation omitted; internal quotation marks omitted.) *Jewett* v. *Jewett*, 265 Conn. 669, 690–91, 830 A.2d 193 (2003).

With respect to the financial orders predicated on those findings of fact, "[t]he issues involving financial orders are entirely interwoven. The rendering of a judgment in a complicated dissolution case is a carefully crafted mosaic, each element of which may be dependent on the other. . . . Furthermore, trial courts are endowed with broad discretion to distribute property in connection with a dissolution of marriage." (Citation omitted; internal quotation marks omitted.) *Greco* v. *Greco*, 275 Conn. 348, 354, 880 A.2d 872 (2005).

Ordinarily, resolution of the first certified issue in the present case would require us to review the record and to determine first whether the trial court's finding that the defendant had reduced the marital estate by $2.9 million was clearly erroneous, but nevertheless harmless. In the present case, however, two separate, but related, breakdowns of basic appellate procedure require that the trial court's judgment be affirmed because this intensely factual issue is incapable of meaningful evaluation by any reviewing court. The first procedural shortfall is the defendant's failure to move for articulation or rectification of the underpinnings of the trial court's factual findings in a case involving an unnecessarily complicated and voluminous record.[9]

---

[9] We pause to express our dismay at the state of this record. By way of bulk, it contains sixteen volumes of testimony that is at once contradictory and repetitive. Financial documents, many of which were not present because of the defendant's failure to comply with certain discovery requests, would have, however, been a worthwhile addition to this record's already considerable girth. In this case, pictures in the form of financial statements might have been worth many thousands of words, and would have given

The second is the defendant's failure to raise his claims with respect to the $2.9 million reduction of assets until oral argument before the Appellate Court.

## A

Beginning with the defendant's failure to move for an articulation or rectification pursuant to Practice Book § 66-5,[10] we note that the trial court's memorandum of

both the trial and reviewing courts a more concrete frame of reference for its calculations than wading through volumes of testimony about the assets.

We note, however, that the defendant had discarded the financial documents that the plaintiff had requested during discovery, and had made no effort thereafter to obtain them from the relevant institutions in response to the discovery requests. The trial court, faced with additional delays of a trial that already had been the subject of several continuances, sanctioned the defendant for his noncompliance by ordering him to pay $1250 of the plaintiff's attorney's fees, and then precluded both parties from introducing into evidence any outstanding financial documents that they thereafter might be able to obtain.

[10] Practice Book § 66-5 provides in relevant part: "A motion seeking corrections in the transcript or the trial court record or seeking an articulation or further articulation of the decision of the trial court shall be called a motion for rectification or a motion for articulation, whichever is applicable. Any motion filed pursuant to this section shall state with particularity the relief sought. . . .

"The appellate clerk shall forward the motion for rectification or articulation and the opposition, if any, to the trial judge who decided, or presided over, the subject matter of the motion for rectification or articulation for a decision on the motion. If any party requests it and it is deemed necessary by the trial court, the trial court shall hold a hearing at which arguments may be heard, evidence taken or a stipulation of counsel received and approved. The trial court may make such corrections or additions as are necessary for the proper presentation of the issues raised or for the proper presentation of questions reserved. The trial judge shall file the decision on the motion with the appellate clerk.

"Nothing herein is intended to affect the existing practice with respect to opening and correcting judgments and the records on which they are based. The trial judge shall file any such order changing the judgment or the record with the appellate clerk. . . .

"Any motion for rectification or articulation shall be filed within thirty-five days after the delivery of the last portion of the transcripts or, if none, after the filing of the appeal, or, if no memorandum of decision was filed before the filing of the appeal, after the filing of the memorandum of decision. . . ."

decision cites only the "testimony" in support of its conclusion that the marital assets were reduced by approximately $2.9 million, as calculated by the addition of approximately $700,000 in charitable donations, $1.1 million in counsel fees, and the liquidation of retirement funds. Although the trial court stated that it could not make more specific findings because of the defendant's failure to provide certain financial records in response to discovery requests; see footnote 9 of this opinion; the memorandum nevertheless does not specify the exact sources of the numbers that it used to calculate the $2.9 million reduction. Indeed, at oral argument before the Appellate Court, Judge Schaller pointed out the defendant's failure to move for further articulation with respect to any link between the $2.9 million reduction and the trial court's ultimate financial orders.[11]

"As is always the case, the [appellant], here the [defendant], bear[s] the burden of providing a reviewing court with an adequate record for review." *Cable* v. *BIC Corp.*, 270 Conn. 433, 442, 854 A.2d 1057 (2004), citing, e.g., Practice Book § 61-10.[12] "It is, therefore, the responsibility of the appellant to move for an articulation or rectification of the record where the trial court has failed to state the basis of a decision . . . to clarify the legal basis of a ruling . . . or to ask the trial judge to rule on an overlooked matter. . . . In the absence

---

[11] We note that the only appearance in the record of a motion for articulation is a motion filed by the plaintiff for permission to file a late motion for articulation of the trial court's order with respect to counsel fees. The Appellate Court denied that motion.

[12] Practice Book § 61-10 provides: "It is the responsibility of the appellant to provide an adequate record for review. The appellant shall determine whether the entire trial court record is complete, correct and otherwise perfected for presentation on appeal. For purposes of this section, the term 'record' is not limited to its meaning pursuant to Section 63-4 (a) (2), but includes all trial court decisions, documents and exhibits necessary and appropriate for appellate review of any claimed impropriety."

of any such attempts, we decline to review this issue." (Internal quotation marks omitted.) *Schoonmaker* v. *Lawrence Brunoli, Inc.*, 265 Conn. 210, 232, 828 A.2d 64 (2003); see also *Zahringer* v. *Zahringer*, 262 Conn. 360, 370, 815 A.2d 75 (2003) ("[i]t is the responsibility of the appellant to move for an articulation in order to clarify the basis of the trial court's decision should such clarification be necessary for effective appellate review of the issue on appeal"). "[A]n articulation is appropriate where the trial court's decision contains some ambiguity or deficiency reasonably susceptible of clarification. . . . [P]roper utilization of the motion for articulation serves to dispel any . . . ambiguity by clarifying the factual and legal basis upon which the trial court rendered its decision, thereby sharpening the issues on appeal." (Internal quotation marks omitted.) *Alliance Partners, Inc.* v. *Oxford Health Plans, Inc.*, 263 Conn. 191, 204, 819 A.2d 227 (2003).

The defendant's attribution of the trial court's calculations to its one-sided wholesale adoption of the plaintiff's trial memorandum notwithstanding, without a motion for articulation or rectification, there is no way short of a crystal ball for a reviewing court to ascertain the precise basis for the trial court's decision in this voluminous record. The defendant also faults the plaintiff for failing to move for the articulation, noting that these rules apply equally to appellees seeking affirmance of a trial court decision on alternate grounds. See *Zahringer* v. *Zahringer*, supra, 262 Conn. 370. These arguments, however, illustrate the very purpose of a motion for articulation or rectification. An articulation or rectification by the trial court would have, at the very least, aided the reviewing courts in determining the basis or lack thereof in the record for the trial court's decision, and also would have afforded the trial court, as the finder of fact, the opportunity to correct any miscalculations. Inasmuch as the defendant

is the party who has chosen belatedly to attack the trial court's factual findings on appeal, it is he who has elected to bear the burden of moving for an articulation or rectification of the trial court's decision. Accordingly, because neither the Appellate Court nor this court could review this claim in a meaningful manner, we must conclude that the Appellate Court properly affirmed the judgment of the trial court.

B

Furthermore, even if the record had been adequate for review of the defendant's claims with respect to the $2.9 million reduction, the defendant abandoned those claims by failing to raise them properly before the Appellate Court. As the defendant himself conceded at oral argument before this court, although he claimed in the Appellate Court that the trial court's financial orders were an abuse of its discretion, the $2.9 million reduction did not form a distinct basis for his claim on appeal.[13] Indeed, the defendant's written claims in the Appellate Court with respect to the financial orders centered on his argument that "the impact of the financial awards is more punitive than equitable," which is a paradigmatic characterization of an ordinary abuse of discretion claim. See, e.g., *Greco* v. *Greco*, supra, 275 Conn. 363 (affirming judgment of Appellate Court reversing financial orders that "forced [the defendant] to the brink of abject poverty" as result of disproportionate asset division and alimony and insurance payments). The only mention of the $2.9 million in the

---

[13] The relevant point heading in the defendant's Appellate Court brief stated: "The Trial Court Abused Its Discretion in Making Financial Orders that Lacked Evidentiary Support and that, Inter Alia, Awarded the Plaintiff Lump Sum Alimony and Title to Both Connecticut Properties, Thereby Leaving the Defendant Without a Connecticut Residence, Where the Plaintiff Possessed Substantial Earnings and Assets in Her Own Right." While quite the mouthful, it obviously says nothing about an improperly counted $2.9 million.

defendant's Appellate Court brief is contained not in the *argument* section, but rather in the *nature of proceedings and statement of facts.*[14] The argument section of the defendant's Appellate Court brief does not mention the $2.9 million at all, instead addressing reasons why the property distribution rendered the "impact of the financial awards . . . more punitive than equitable." The defendant attacks the factual underpinning in only one paragraph at the end of that argument section, never challenging the predicate $2.9 million figure, and disputed only the trial court's conclusions that the plain-

[14] In his statement of facts, the defendant, purportedly describing the trial court's memorandum of decision, states: " 'The testimony permits the court [to] find that in the years from 1998 to 2002, the defendant earned approximately $311,000 and the marital assets were reduced by approximately $2.9 million dollars.' These exact numbers are found on page twenty-one of the plaintiff's trial brief. The court cites the attorney's fees paid by the defendant and his charitable contributions, which the court found to be $700,000.00, a number found on page [twenty] of the plaintiff's trial brief which in turn includes 'estimations' totaling over $280,000, made by counsel. It ignores Judge Tierney's ruling of September 29, 1997, in the Stamford action allowing the parties to contribute up to $200,000 per year to [Internal Revenue Service] approved charities, and incorrectly states that the contributions were in violation of the automatic orders, as there were no automatic orders in the Stamford action as it had been filed prior to October 1, 1997. And while the plaintiff's $2.9 million figure also included stock depreciation due to market fluctuations, those numbers were not in evidence and the court declined to specify this aspect, instead faulting the defendant for selling shares of [General Electric] stock, even though Judge Tierney's order allowed him to do so without express court permission and those numbers were not in evidence."

This discussion in the statement of facts does not constitute adequate briefing of this factual issue. First, it is buried in the statement of facts and is not a distinctly raised separate point on appeal, which precludes effective review of the issue. Cf. *Hirtle* v. *Hirtle*, 217 Conn. 394, 403 n.8, 586 A.2d 578 (1991) (considering "doubtful" "procedural propriety" of alternate ground for affirmance not properly raised pursuant to Practice Book § 4013 [a], now § 63-4). Second, to the extent that it is a claim on appeal, it violently disregards Practice Book § 67-4, which is the rule governing the organization of appellate briefs. For helpful additional guidance, see W. Horton & K. Bartschi, Connecticut Rules of Appellate Procedure Annotated (2005 Ed.) § 67-4, comment B2, p. 210 (noting that statement of facts "should never be argumentative in nature; save that for your argument").

tiff contributed $970,000 to the parties' marital assets and the defendant depleted the assets based on a total of $717,000 in charitable contributions.[15] Other than stating that those conclusions rest solely on "evidence that is not in the record," the defendant failed, however, to identify the evidence that actually is in the record to explain why these figures are clearly erroneous.

The defendant, however, shifted gears at oral argument before the Appellate Court,[16] when he clearly attacked the award's underpinnings and argued that the $2.9 million is a figure that "doesn't exist." He claimed that the $2.9 million has "zero support" in the record and was arrived at by "double count[ing]," because that number was calculated by adding the liquidated retirement funds to the counsel fees and the charitable donations, when in fact the liquidated funds had paid for both the counsel fees and the donations. The defendant also attacked the findings of the trial court, *Doherty, J.*, with respect to the charitable donations, stating that several hundred thousand dollars should not have been counted against the defendant because they had been authorized by the court, *Tierney, J.*, when this action previously was pending in Stamford.[17]

---

[15] The defendant also attacks the trial court's failure to consider the nearly $4000 per month in charitable donations made by the plaintiff to her church, Inspiration Ministries. See also footnote 3 of this opinion.

[16] In September, 2004, we granted the defendant's motion to include the transcript of the Appellate Court oral argument in the record on appeal to this court.

[17] In response, the plaintiff claimed at oral argument before the Appellate Court that the $2.9 million could be arrived at by adding $400,000 in annual living expenses for several years when the defendant was unemployed, to $1.8 million, derived at by adding $700,000 in charitable contributions to $1.1 million in counsel fees. Indeed, the plaintiff also cited the defendant's own admission during cross-examination that the value of the marital estate had diminished by close to $2.9 million when the two financial affidavits were compared. The plaintiff also stated that the order by the trial court in Stamford, *Tierney, J.*, no longer was in effect after the action was withdrawn from that court and refiled in Danbury, and also that the defendant's financial circumstances had changed; he was earning several hundred thousand dollars per year while the action was pending in Stamford, but was

It is well settled that claims on appeal must be adequately briefed, and cannot be raised for the first time at oral argument before the reviewing court. See, e.g., *State* v. *Robert H.*, 273 Conn. 56, 85, 866 A.2d 1255 (2005); *Lafayette* v. *General Dynamics Corp.*, 255 Conn. 762, 781, 770 A.2d 1 (2001). Claims that are inadequately briefed generally are considered abandoned. See, e.g., *Ward* v. *Greene*, 267 Conn. 539, 546, 839 A.2d 1259 (2004). Moreover, a claim that has been abandoned during the initial appeal to the Appellate Court cannot subsequently be resurrected by the taking of a certified appeal to this court.[18] See *State* v. *Robert H.*, supra, 85–86 (declining to reach claim that, in addition to being outside scope of certified question, was not briefed by state and not raised until oral argument before Appellate Court).

Having reviewed the defendant's written filings before the Appellate Court, and the transcript of oral argument before that court, we conclude that the defendant did not raise the factual issue with respect to the $2.9 million reduction until oral argument before the Appellate Court. The defendant, therefore, abandoned the issue before that court and for the remainder of the proceedings on appeal, and the Appellate Court should not have decided it as a claim on appeal.[19] Accordingly,

unemployed when the trial court heard the case in Danbury. Later in the argument, in response to further questioning from the court, the plaintiff's counsel reduced that figure to $2.4 million, by adding $700,000 in charitable contributions to $1.1 million in legal fees, and $600,000 in living expenses. The plaintiff then explained that the additional $500,000 could be obtained by the unaccounted-for 40,635 shares in General Electric stock, which had been liquidated at a sum that could not be determined precisely because of the lack of financial records.

[18] This rule, of course, does not apply to issues involving subject matter jurisdiction, which may be raised by the parties or the court, sua sponte, at any stage of the proceedings. See, e.g., *Broadnax* v. *New Haven*, 270 Conn. 133, 153, 851 A.2d 1113 (2004).

[19] In his reply brief, the defendant requests that we review the trial court and the Appellate Court decisions for plain error in the event that we conclude that his claim was inadequately briefed and, therefore, abandoned. We decline his invitation to engage in plain error review. Claims, including

we affirm the judgment of the Appellate Court to the extent that it affirmed the financial orders of the trial court.[20]

## II

We now turn to the plaintiff's appeal from the judgment of the Appellate Court concluding that the trial court abused its discretion by directing the defendant to pay $100,000 of her attorney's fees. *Grimm* v. *Grimm*,

requests for plain error review, are unreviewable when raised for the first time in a reply brief. See, e.g., *Calcano* v. *Calcano*, 257 Conn. 230, 244, 777 A.2d 633 (2001); cf. *Lebron* v. *Commissioner of Correction*, 274 Conn. 507, 532, 876 A.2d 1178 (2005) (declining to reach unpreserved constitutional claims when habeas petitioner did not request review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 [1989], until he filed his reply brief). "Our practice requires an appellant to raise claims of error in his original brief, so that the issue as framed by him can be fully responded to by the appellee in its brief, and so that we can have the full benefit of that written argument. Although the function of the appellant's reply brief is to respond to the arguments and authority presented in the appellee's brief, that function does not include raising an entirely new claim of error." (Internal quotation marks omitted.) *Calcano* v. *Calcano*, supra, 244.

We further note that the defendant's reliance on *Schoonmaker* v. *Lawrence Brunoli, Inc.*, supra, 265 Conn. 266 n.69, for the proposition that a request for plain error review may be made in a reply brief, is misplaced. In that case, although this court did not recite the principle precluding plain error review for claims raised for the first time in a reply brief, we nevertheless declined to engage in that review because that claim was inadequately briefed. Id. Finally, even assuming that this claim was properly raised and briefed before the Appellate Court, we cannot say that, given the disastrous state of this record, that this is a "truly extraordinary [situation] where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) Id.

[20] We remind the defendant that "[o]ur refusal to upset the property and alimony awards in this case does not constitute an abdication of our responsibility for appellate review. To the contrary it evidences a recognition on our part that by constitutional charter we are limited to corrections of errors of law . . . and that, therefore, in matters of this sort our role of necessity is not to work the vineyard but rather to prune the occasional excrescence." (Citation omitted.) *Koizim* v. *Koizim*, 181 Conn. 492, 498, 435 A.2d 1030 (1980). Failure to present an adequate record and a properly briefed claim constitutes an invitation to "work the vineyard"—an invitation that we necessarily must decline.

supra, 82 Conn. App. 56. The plaintiff claims that the trial court properly considered the defendant's conduct during the litigation in its decision to award her fees, and that the award was necessary to avoid undermining the other financial orders. The defendant claims in response that the attorney's fee award was improperly punitive in nature, and that the record demonstrates that both parties were able to pay their own attorney's fees without undermining the other financial orders. We conclude that the trial court did not abuse its discretion by awarding the plaintiff $100,000 in attorney's fees, and we reverse the judgment of the Appellate Court to the contrary.

We begin with a brief review of the Appellate Court's treatment of this issue. The Appellate Court stated that, "[a] clear picture of the plaintiff's financial status can be gained by a review of the court's financial orders and her financial affidavit. The plaintiff earned a salary of more than $100,000 a year, possessed significant retirement accounts and had valuable stock options from her employer, General Electric. She was awarded both of the parties' Connecticut residences, which were valued together at more than $1 million, and received a lump sum alimony award of $100,000." Id., 54. The Appellate Court cited General Statutes § 46b-62,[21] which governs the award of attorney's fees in dissolution actions, and concluded that the trial court had abused its discretion by awarding attorney's fees because "the record does not support a finding that the plaintiff lacked sufficient liquid assets with which to pay her counsel fees or that the failure to award such fees would have undermined the court's other financial orders. The

---

[21] General Statutes § 46b-62 provides in relevant part: "In any proceeding seeking relief under the provisions of this chapter and sections 17b-743, 17b-744, 45a-257, 46b-1, 46b-6, 46b-212 to 46b-213v, inclusive, 47-14g, 51-348a and 52-362, the court may order either spouse . . . to pay the reasonable attorney's fees of the other in accordance with their respective financial abilities and the criteria set forth in section 46b-82. . . ."

plaintiff earned more than $100,000 a year, had sizeable investments and was awarded $100,000 in alimony. She also no longer had a need for two residences in Connecticut, as she had purchased the second home when she separated from the defendant." Id., 54–55.

The Appellate Court noted further that "[a]mple liquid funds, however, are not an absolute litmus test for an award of counsel fees"; id., 55; and cited this court's decision in *Maguire* v. *Maguire*, 222 Conn. 32, 44, 608 A.2d 79 (1992), for the proposition that, " '[t]o award counsel fees to a spouse who had sufficient liquid assets would be justified, if the failure to do so would substantially undermine the other financial awards.' " *Grimm* v. *Grimm*, supra, 82 Conn. App. 55. The Appellate Court, however, reversed the fee award, concluding that the trial court "made no such finding that the award was necessary to avoid undermining its other financial orders," and that "there is nothing in the record to support such a finding." Id. The Appellate Court then stated that it did not need to remand the case for further proceedings because the fee award was severable from the other orders. Id., 56.

"[Section] 46b-62 governs the award of attorney's fees in dissolution proceedings. That section provides in part that the court may order either spouse . . . to pay the reasonable attorney's fees of the other in accordance with their respective financial abilities and the criteria set forth in section 46b-82. . . . The criteria set forth in § 46b-82 are the length of the marriage, the causes for the annulment, dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate and needs of each of the parties and the award, if any, which the court may make pursuant to section 46b-81, and, in the case of a parent to whom the custody of minor children has been awarded, the desirability of such parent's securing employment.

In making an award of attorney's fees under this section, [t]he court is not obligated to make express findings on each of these statutory criteria. . . .

"Courts ordinarily award counsel fees in divorce cases so that a party . . . may not be deprived of [his or] her rights because of lack of funds. . . . Where, because of other orders, both parties are financially able to pay their own counsel fees they should be permitted to do so. . . . *Koizim* v. *Koizim*, 181 Conn. 492, 501, 435 A.2d 1030 (1980). An exception to the rule announced in *Koizim* is that an award of attorney's fees is justified even where both parties are financially able to pay their own fees if the failure to make an award would undermine its prior financial orders . . . . *Eslami* v. *Eslami*, 218 Conn. 801, 820, 591 A.2d 411 (1991). Whether to allow counsel fees [under § 46b-82], and if so in what amount, calls for the exercise of judicial discretion. . . . *Holley* v. *Holley*, [194 Conn. 25, 33–34, 478 A.2d 1000 (1984)]. An abuse of discretion in granting counsel fees will be found only if [an appellate court] determines that the trial court could not reasonably have concluded as it did." (Citation omitted; internal quotation marks omitted.) *Bornemann* v. *Bornemann*, 245 Conn. 508, 542–43, 752 A.2d 978 (1998). The trial court need not make an express finding with respect to whether the fee award is necessary to avoid undermining the other financial orders, so long as the record supports that conclusion. Id., 544–45.

In the present case, the record supports the conclusion that the attorney's fee award was necessary to avoid undermining the trial court's other financial orders, specifically that of lump sum alimony, and that the trial court did not, therefore, abuse its discretion by making such an award. Although the plaintiff was by no means rendered destitute by this action, "ample liquid funds [are] not an absolute litmus test for an award of counsel fees." (Internal quotation marks omit-

ted.) *Maguire* v. *Maguire*, supra, 222 Conn. 44. Rather, the structure of the trial court's memorandum of decision indicates that the court clearly intended that the plaintiff receive $100,000 in lump sum alimony, in addition to the $100,000 contribution to her attorney's fees. The Appellate Court's vacatur of the $100,000 attorney's fee order necessarily eviscerates any benefit that the plaintiff received as a result of the lump sum alimony award, particularly given the $182,913 in attorney's fees that she incurred in connection with the Danbury action.[22] Accordingly, the trial court reasonably could have determined that the fee award was necessary to avoid undermining the lump sum alimony order.[23]

[22] The trial court stated that the plaintiff had paid approximately $233,000 in attorney's fees. That figure is the total fee for the Danbury and Stamford actions. In this appeal, however, we need only consider the Danbury action, for which the plaintiff incurred $182,913 in fees. The Danbury action involved a sixteen day trial of a case without custody or complex valuation issues, the filing of grievances against the plaintiff's attorneys, eight motions for continuances, and the need to respond to a General Statutes § 52-265a petition brought to the Chief Justice by the defendant in an attempt to appeal from the denial of one of those motions. The specific amount of the attorney's fee award is not at issue in this certified appeal.

With respect to that fee amount, however, we note that the plaintiff is not completely blameless in the evolution of this relatively simple dissolution case into a protracted, expensive morass. We note, in particular, her multiple motions to strike portions of the defendant's briefs that were filed before this court, substantial portions of which were occasioned by citation discrepancies created by a formatting error that had occurred when the electronic transcripts were converted to standard format. This is a problem that could and should have been resolved by a courtesy call between counsel, rather than more expensive and time consuming motion practice before this court.

[23] The defendant, relying on the trial court's finding that the defendant had threatened the plaintiff that he would "drag out" any litigation and cause her to spend over $100,000 in attorney's fees unless she agreed to give him 80 percent of the marital assets, contends that the award is improperly punitive. See *Blake* v. *Blake*, 211 Conn. 485, 488, 560 A.2d 396 (1989) ("[p]unishment of a litigant should play no role in the determination of the issue of awarding attorney's fees"). That finding, however, ultimately has no bearing on the propriety of the specific attorney's fee order in the present case, which the trial court reasonably concluded was necessary to avoid undermining the lump sum alimony award. In this case, the award of fees is not an abuse of the trial court's discretion because the amount of that award is both: (1) supported by objective evidence in the record, including the fee affidavits of the plaintiff's counsel; and (2) does not exceed the

On the plaintiff's appeal, the judgment of the Appellate Court is reversed as to its order reversing the trial court's judgment awarding attorney's fees to the plaintiff and the case is remanded to the Appellate Court with direction to affirm the judgment of the trial court; on the defendant's appeal, the judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

amount necessary to avoid undermining the other financial orders in the case. See *Burton* v. *Burton*, 189 Conn. 129, 142 n.16, 454 A.2d 1282 (1983) (rejecting defendant's argument that trial court's review of proceedings characterized award as "effectively punishing the defendant for presenting a 'vigorous defense' " because "the length of the proceedings and the time expended by counsel are relevant when the amount of the award is set"). Accordingly, we reject the defendant's contention that the attorney's fee award was improperly punitive or "akin to double jeopardy" because the court already had sanctioned him in April, 2002, for failure to keep all of his financial records.