VICTOR G. ANDERSON *v.* BETTY ANDERSON
(10634)

PETERS, HEALEY, PARSKEY, SHEA and F. HENNESSY, Js.

Argued May 11—decision released August 9, 1983

*James H. Lee,* with whom, on the brief, was *Jack L. Grogins,* for the appellant (defendant).

*Wayne D. Effron,* with whom was *Joel M. Kaye,* for the appellee (plaintiff).

ARTHUR H. HEALEY, J. This is an appeal from the financial orders incident to the judgment dated January 19, 1981, dissolving the eighteen year marriage of the parties and a post-decree supplementary judgment dated December 29, 1981, awarding attorney's fees to the plaintiff, Victor Anderson, to defend this appeal taken by the defendant, Betty Anderson.[1] We will discuss these matters separately.

The state trial referee's, *Hon. Raymond J. Devlin,* memorandum of decision, dissolving the marriage and entering the financial orders, discloses, inter alia, the following: The parties were married on July 28, 1962,

---

[1] The defendant, acting pursuant to Practice Book § 3062, amended her appeal, for the purpose of obtaining review of the post-decree award of attorney's fees to the plaintiff.

each having been previously divorced. At the time of the decree the husband was 68 years old and the wife was 57 years old. There are no children involved. The marriage had broken down irretrievably and "the actions and conduct of both contributed equally to the separation" of the parties. At the time of the marriage the plaintiff was the president and chief executive officer of the Victor Anderson 3D Studios engaged in the manufacture of 3D pictures and he owned 99 percent of the stock. At that time the defendant was a "nationally celebrated harpist" having toured the country giving concerts, appearing on radio and television shows and making her own record albums. The family home is located on Dancing Bear Road in the Rowayton section of Norwalk. The plaintiff purchased the land for this home, and supervised and completely paid for the construction of the dwellings on it.[2] There was no contribution by the defendant. The plaintiff then conveyed title to the defendant, at which time it was free and clear. Originally, income from the plaintiff's business carried all the expenses of upkeep.

In 1972, the plaintiff suffered a heart attack and the defendant gave up her professional career and assisted in the running of the business, preparing herself by going back to college for the required business courses.[3] When the plaintiff's business started experiencing financial problems, it continued with loans from banks and help from the defendant's relatives.[4] The court also found that the defendant "still has proficient skill as

---

[2] The evidence was that prior to the marriage the plaintiff purchased this land upon which a house was built in 1961.

[3] The defendant was a graduate of Goucher College where she majored in music. After going into the business, she took and successfully completed courses in business law, accounting, personal income tax, corporate income tax and speech.

[4] The evidence indicates that from about 1973 until the time of trial the defendant received financial assistance from her family not only for the business but for household purchases.

a harpist and is in a position to carry on with her music; some of her needs at the present are taken care of by the rental income of the [family home] property; she received $6000 from the sale of the yacht; and apparently from contributions by her family there is the possibility of the future acquisition of capital assets." Because of his health and the subsequent loss of business from his 3D corporation, the plaintiff has been forced to go to work for his brother earning a weekly net income of $262.[5] Additionally, the court found that his employability in his given field was "negligible" and that there was no credible evidence as to his opportunity for the future acquisition of capital assets.

In its decree of January 19, 1981, the trial court ordered that the family home "be sold on or before July 1, 1981; that after payment of the mortgage and encumbrances on the property (including the $9797.44 debt owing from the plaintiff to the Union Trust) and the necessary expenses of closing—the net proceeds be divided forty percent to the plaintiff and sixty percent to the defendant."[6] It noted that no alimony was awarded to either party. The defendant had sought attorney's fees "amounting to over $6200"; the court denied her claim stating that "[u]nder the facts presented in this case there is no basis for the award of counsel fees." The court's memorandum also stated that it was agreed that the defendant would return to

---

[5] Although it does not appear in the memorandum of decision, there appears no question that the plaintiff left the family home in October, 1978.

[6] In its memorandum, the court, just prior to the language ordering the sale on or before July 1, 1981, stated: "In the event a financial settlement between the parties is not accomplished by April 1, 1981, an order will enter transferring a one-half interest in the property at Dancing Bear Road, Rowayton, to the plaintiff . . . ."

The defendant filed her appeal on February 5, 1981. On February 23, 1981, the plaintiff filed his motion to terminate the stay of execution with respect to order of sale on or before July 1, 1981. The court denied his motion on April 3, 1981.

the plaintiff that personal property set out on a list filed by him. Furthermore, the decree set out that it was agreed that both parties were to retain that portion of Victor Anderson 3D Studios, Inc., which they then owned.[7]

In her appeal the defendant asserts that, in the course of making its financial orders, the trial court made three factual determinations which are not supported by the evidence. The determinations she refers to are: (1) "The plaintiff bought the property (on which the family home is located), supervised and completely paid for the construction of the dwellings and then conveyed title to the defendant. All expenses in the purchase of the property and erection of the dwelling were paid by the plaintiff; there was no contribution by defendant; title was given to her free and clear. . . ." (2) "Defendant at the time [of the marriage] was a nationally celebrated harpist having toured the country giving concerts, appearing on radio and [television] shows and making her own record albums. . . . Defendant still has proficient skill as a harpist and is in a position to carry on with her music." (3) "Apparently from contributions by [the defendant's] family there is the possibility of the future acquisition of capital assets." In her brief, she argues that she has appealed from the judgment because the financial orders of the trial court were based on these factual determinations which are not supported in the record. We will discuss these claims seriatim.

On her first claim, the defendant asserts that the trial court erred in failing to find that she had contributed to the acquisition, preservation and appreciation in

---

[7] The memorandum specifically provided that "[n]o order will enter relative to the transfer of the stock owned by the plaintiff." The plaintiff owned 99 percent of the stock in Victor Anderson 3D Studios, Inc., and the defendant owned 1 percent. Each party listed no value for such stock in their most recent financial affidavits prior to the decree.

value of the family home. We do not agree. There was evidence that the plaintiff acquired the land in 1961, that he designed and supervised the building of the house there, and that he paid for the land and the building of the house. When the defendant became the owner of the whole title in 1972[8] by a warranty deed from the plaintiff, the property was free and clear.[9] The determination that there was no contribution by the defendant is proper, made as it is by the court as of the time the defendant received title in 1972. Her claim that the court failed to find that she contributed to the acquisition, preservation and appreciation in value[10] is without merit for at least two reasons. First, acceptance of this claim would require this court to find facts that the record discloses the trial court did not. We are not finders of fact; that is for the trial court. *Robert Lawrence Associates, Inc.* v. *Del Vecchio,* 178 Conn. 1, 4, 420 A.2d 1142 (1979); *Riccio* v. *Abate,* 176 Conn. 415, 418, 407 A.2d 1005 (1979); *Soneco Service, Inc.* v. *Bella Construction Co.,* 175 Conn. 299, 300, 397 A.2d 1364 (1978). We, however, do make certain observations. She claims that the court should have concluded that in addition to placing a $60,000 mortgage on the house in 1974, which she[11] contends was used to satisfy the obli-

---

[8] In 1963, the plaintiff conveyed a one-half interest in the property to the defendant. In 1972, he conveyed the balance of the title to her.

[9] The warranty deed indicates that there were grants for utility services, certain rights of others in a stream on the property, as well as certain restrictive covenants.

[10] Although the trial court did not make a finding of the value of the property, the memorandum points out that her financial affidavit of January 11, 1980, lists the value at $200,000, whereas her affidavit of September 24, 1980, lists the value as $172,500. It comments that "[t]here was evidence at the trial that the fair market value was $238,300 [this was the figure testified to by the appraiser called by the plaintiff; the appraiser called by the defendant testified to value as being $155,000]." The memorandum, however, also states: "The disputed amount of equity would be over $100,000."

[11] There was evidence that her brother Jack Glamann also became personally obligated on the note at that time.

gations of the business, she alone has made the monthly mortgage payments of $503.52. Because we cannot find facts, we cannot say that the trial court did not also consider that there was evidence that the plaintiff opposed the mortgaging of the house which he had given her free and clear prior to the mortgage. We will not speculate that the trial court did extend credence to her claim because it directed the net proceeds of the sale it had ordered to be divided 60 percent for the defendant as against 40 percent for the plaintiff. In addition, the record is barren of any indication that the defendant ever attempted to seek any further articulation of the factual basis of the trial court's decision in this regard. Practice Book § 3082; *Pandolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 222n, 435 A.2d 24 (1980).

The next factual determination attacked as unsupported by the evidence is: "Defendant at the time [of the marriage] was a nationally celebrated harpist having toured the country giving concerts, appearing on radio and [television] shows and making her own record albums. . . . Defendant still has proficient skill as a harpist and is in a position to carry on with her music." She does admit in her brief that she majored in music at Goucher College, that she supported herself by working at her music from 1952 to 1962 (a period after her first divorce and prior to the time of her marriage to the plaintiff), that she had appeared on television programs, that she has made three record albums as a soloist with the most recent in the 1960s and that she played one summer with Duke Ellington's orchestra and went on tour with that orchestra for two months. She also maintains that *after* she married the plaintiff, she never made more than $163 at music in a single year. She admits that she has given lessons on the harp and she is capable of doing so "right now." She also

points out that she played the harp at the wedding of Duke Ellington's sister, Ruth Ellington; an examination of the transcript discloses additionally that this occurred in 1980. None of this evidence, she argues, supports the determination that she *was* "a nationally celebrated harpist," nor that she had "toured the country giving concerts."[12]

The trial court's memorandum observes that the case was "extensively tried"; our examination of the transcript bears this out. There was before that court from the defendant herself other evidence in this area. This included testimony that while she had made three albums as a soloist she had no idea how many records she played on as a "background musician," as well as testimony of her having made television and radio commercials and having played on Broadway. There was also evidence where she admitted that Ruth Ellington is "always trying to push [my] career."

Whether the defendant "was," as the court stated, "a nationally celebrated harpist" presented a question of fact for the trier. Reasonable minds could differ on the evidence in a resolution of this question. There was, however, evidence which does support this determination and, therefore, it is not clearly erroneous. Practice Book § 3060D. The same can be said of the court's statement that she still has proficient skill as a harpist and is in a position to carry on with her music.[13]

One further matter should be addressed before we leave this aspect of her claim. Her brief suggests that the trial court concluded as it did "about the defend-

---

[12] The argumentation on this last point is that "Duke Ellington toured the country giving concerts, and that the defendant had accompanied him as a member of the orchestra."

[13] There was evidence that the defendant still maintains her membership in the musicians' union and that she is "always looking for a job playing the harp."

ant's employability or earning capacity as a musician" in contravention of *Schmidt* v. *Schmidt,* 180 Conn. 184, 429 A.2d 470 (1980). The argument seems to go this way: there was no evidence of full-time, ongoing employment of the defendant as a musician after she married the plaintiff in 1962 nor of the average income of a musician in this area with the defendant's education, training and experience. There was, she continues, as in the *Schmidt* case, insufficient evidence to support the trial court's conclusions about her employability or earning capacity.

We do not think *Schmidt* is apposite here. Actually, the question posed to us in *Schmidt* was: "When an award of alimony . . . is to be based upon earning capacity, what type of evidence is required to support that award?" *Schmidt* v. *Schmidt,* supra, 190. In that case we found erroneous the trial court's order directing the defendant husband, who once had earned a substantial income as a commodities broker, to pay alimony and support where there was no evidence of any specific amounts of income. In addition, there was no evidence of the typical salary of a commodities broker of that defendant's ability and experience. *Schmidt* v. *Schmidt,* supra, 190–91. The defendant here has turned *Schmidt* around. In *Schmidt,* we required sufficient evidence of earning capacity to pay an alimony or support order to be demonstrated as a requisite to the validity of such an order. No such order was entered in this case. Even if we assume arguendo that it could be pertinent, the evidence from the defendant herself also disclosed that the defendant had had about eight years experience in the business world since 1972, had taken a number of business and tax courses and had run the Victor Anderson 3D Studios, Inc., from 1972 until at least 1978 or 1979. The same court also heard her testify that although she was out of work since 1978 she had made

no attempt to collect unemployment compensation. Again, what consideration the court gave such evidence which arguably touched on her earning capacity we cannot say. We cannot say, therefore, that the court's statement that she was "in a position to carry on with her music" was clearly erroneous.

Finally, the defendant attacks the court's determination that stated: "[A]pparently from contributions by [the defendant's] family there is the possibility of the future acquisition of capital assets." This attack, likewise, lacks merit. In pressing this claim the defendant points to evidence that her mother and brother had contributed to the household and business expenses and argues that there was no testimony that the monies advanced were intended to be anything but loans. She maintains that to support the attacked determination there should be evidence that her family's means are sufficient to afford contributions that would enable her to acquire capital assets and that there was a likelihood that she would receive such contributions. Indeed, in arguing that there was no evidence of this nature the defendant refers to her brother's statement that he was not prepared even to support her.[14]

At the outset, we examine literally the language attacked. If anything, it is largely both cautious and tentative as it says "apparently" from family contributions there is the "possibility" of future acquisition of capital assets. It is true that the defendant and her brother testified that monies involved were loans; yet the court did also use the term "contributions by her family." It is settled that evidence, although uncontradicted, need not be believed. *Sachem's Head Assn.* v.

[14] On direct examination of Jack Glamann the following took place: "Q. Are you prepared to support your sister [the defendant] for the rest of her life?
"A. No."

*Lufkin,* 168 Conn. 365, 368, 362 A.2d 519 (1975); *McLaughlin* v. *Chicken Delight, Inc.,* 164 Conn. 317, 319, 321 A.2d 456 (1973). Where, however, the trier of fact disbelieves testimony of a witness, it is not entitled to conclude that the opposite is true. *Novak* v. *Anderson,* 178 Conn. 506, 508, 423 A.2d 147 (1979); *Martino* v. *Grace-New Haven Community Hospital,* 146 Conn. 735, 736, 148 A.2d 259 (1959); *Edwards* v. *Grace Hospital Society,* 130 Conn. 568, 575, 36 A.2d 273 (1944); *Walkinshaw* v. *O'Brien,* 130 Conn. 151, 153, 32 A.2d 639 (1943). It is true that the defendant and her brother testified that the monies involved were loans,[15] but there was also evidence from the defendant herself that she had never signed a note for these monies and that her family continued sending her money even after the plaintiff left the family home. In addition, her brother testified that he and his mother were paying the rent on the business premises at the time of trial. There was also evidence that the defendant's mother, who was 89 years old at the time of trial, had sent about $40,000 for which no note had been signed.[16] The reasonable thrust of such evidence amply supports the trial court's view that "apparently from contributions by her family there is the possibility of the future acquisition of capital assets." Even though the court could not believe the opposite, i.e., that these

---

[15] There was evidence that sometime before the parties separated Jack Glamann, the defendant's brother, advanced the sums of $50,000, $10,000 and $1000 to assist in the business. These sums are secured by an U.C.C. Article 9 security lien in certain assets of the corporation, i.e., Victor Anderson 3D Studios, Inc. He is the major creditor of the corporation. When the defendant mortgaged the family home in 1974 for $60,000, Jack Glamann joined her in signing the mortgage note. Practically all the avails of that sum, however, went into the business. He also testified that, unlike the monies for which he was protected by the U.C.C. Article 9 security lien, he had not been given any note for the other monies forwarded to her although he had asked the defendant for a note.

[16] The defendant herself testified that her mother "[r]ecently . . . sent me $4000," which she said was for corporate and personal bills.

monies were not loans, there was adequate evidence to justify this tentative and cautious conclusion of the "possibility" referred to. The court certainly did not find that there was an expectancy of an inheritance. See *Krause* v. *Krause,* 174 Conn. 361, 365, 387 A.2d 548 (1978). It did, however, have evidence of large sums of money coming to the defendant from her family, including her mother who did not appear and testify. We have demonstrated that this determination, contrary to the defendant's claim, was supported by evidence.

The defendant's claim that the three factual determinations attacked are not supported by the evidence is rejected. From what we said, there was ample evidence to support each of them. *Scherr* v. *Scherr,* 183 Conn. 366, 369, 439 A.2d 375 (1981); *Pandolphe's Auto Parts, Inc.* v. *Manchester,* supra, 221–22; cf. *Schmidt* v. *Schmidt,* supra, 190–91. As to each determination, there was evidence which, if believed, provided an adequate basis for each of the three conclusions actually reached; that is all that is required. *Hardisty* v. *Hardisty,* 183 Conn. 253, 256, 439 A.2d 307 (1981). In passing, we again point out that "[w]ith respect to the financial awards in a dissolution action, great weight is given to the judgment of the trial court because of its opportunity to observe the parties and the evidence. *Gallo* v. *Gallo,* 184 Conn. 36, 50, 440 A.2d 782 (1981); *Fattibene* v. *Fattibene,* 183 Conn. 433, 442, 441 A.2d 3 (1981); *deCossy* v. *deCossy,* 172 Conn. 202, 204, 374 A.2d 182 (1977)." *Venuti* v. *Venuti,* 185 Conn. 156, 161, 440 A.2d 878 (1981). Moreover, "the power to act equitably is the keystone to the court's ability to fashion relief in the infinite variety of circumstances which arise out of the dissolution of a marriage." *Pasquariello* v. *Pasquariello,* 168 Conn. 579, 585, 362 A.2d 835 (1975); see *Robinson* v. *Robinson,* 187 Conn. 70, 72, 444 A.2d 234 (1982).

We take up now the issue raised by the defendant's amended appeal: whether the trial court erred in its postjudgment award of $2000 in counsel fees to the plaintiff to defend the appeal. The trial court rendered its judgment of dissolution and property disposition on January 19, 1981, from which the defendant took an appeal on February 5, 1981. Thereafter, on February 23, 1981, the plaintiff filed his motion for an award of counsel fees to defend the appeal. After a hearing on that motion,[17] the court, on April 3, 1981, granted it entering an award of $2000 for counsel fees. At that hearing the court took no evidence [18] and there are no new financial affidavits in the record before us if any were filed at that time.

"Whether to allow counsel fees, and if so in what amount, calls for the exercise of judicial discretion." *El Idrissi* v. *El Idrissi,* 173 Conn. 295, 301–302, 377 A.2d 330 (1977) (counsel fees on appeal); *Krasnow* v. *Krasnow,* 140 Conn. 254, 262, 99 A.2d 104 (1953) (counsel fees on appeal). " 'Courts ordinarily award counsel fees in divorce cases so that a party (usually the wife) may not be deprived of her rights because of lack of funds.' " *Fitzgerald* v. *Fitzgerald,* 190 Conn. 26, 30, 459 A.2d 498 (1983), quoting *Koizim* v. *Koizim,* 181 Conn. 492, 500–501, 435 A.2d 1030 (1980). In making its determination regarding attorney's fees on appeal, we deem it appropriate for the court in the exercise of its broad judicial discretion to consider the statutory criteria set out in General Statutes §§ 46b-62 and

[17] At the same time, the trial court also heard the plaintiff's motion to terminate the stay of execution and to permit the property to be sold prior to July 1, 1981, as well as his motion seeking to restrain the defendant from transferring or encumbering this property. The court denied the former motion and granted the latter. That hearing also disclosed that the plaintiff had placed a $100,000 attachment on this property.

[18] The transcript of that hearing does disclose that the plaintiff did state that he was then averaging about $270 per week.

46b-82 and the respective financial abilities of the parties. *Koizim* v. *Koizim,* supra, 501; see *Murphy* v. *Murphy,* 180 Conn. 376, 380, 429 A.2d 897 (1980). Recently, in *Fitzgerald* v. *Fitzgerald,* supra, we pointed out that, in the exercise of the trial court's discretion concerning an award of counsel fees, "the availability of 'sufficient cash' to pay one's attorney's fees is not an absolute litmus test for making an award pursuant to General Statutes § 46b-82. . . . This is because a trial court's discretion should be guided so that its decision regarding attorney's fees does not undermine its purpose in making any other financial award." *Fitzgerald* v. *Fitzgerald,* supra, 33–34; see *Devino* v. *Devino,* 190 Conn. 36, 38–39, 458 A.2d 692 (1983).

This leads to a consideration of the matter of "ample liquid funds." See, e.g., *Fitzgerald* v. *Fitzgerald,* supra; *Koizim* v. *Koizim,* supra, 501. "Whether a spouse has 'ample liquid funds' with which to pay counsel fees; see *Koizim* v. *Koizim,* 181 Conn. 492, 435 A.2d 1030 (1980); can only be determined by examining the total financial resources of the parties in light of the statutory criteria." *Venuti* v. *Venuti,* supra, 163. A determination of what constitutes "ample liquid funds," justifying the granting of a request for counsel fees on appeal, requires a consideration of whether the award so made would undermine the court's prior financial orders. See *Fitzgerald* v. *Fitzgerald,* supra, 34. This makes necessary an examination of the total assets of the parties at the time the award is made. The award in question was made about four months after the case was tried and about two months postjudgment. Moreover, this award was entered just over six months after the filing of both parties' most recent financial affidavits. In the judgment, the court had denied the defendant's

request for counsel fees.[19] The plaintiff argues that he made no claim for counsel fees at the trial and, therefore, he was properly in the position to seek them on appeal. In this case, this circumstance is not crucial, particularly because there is no indication that the parties are any better or any worse off insofar as "ample liquid funds" are involved than they were at the time of the judgment of dissolution. The status of both parties at that time vis-a-vis "ample liquid funds" is not explicitly disclosed by the trial court's memorandum. We do not know what "liquid assets" of the defendant the trial court found "ample"; see *Arrigoni* v. *Arrigoni*, 184 Conn. 513, 519, 440 A.2d 206 (1981); so as to justify the award of counsel fees. Moreover, a close inspection of the property disposed of by the judgment discloses that the family home was the only real asset capable of generating the funds to respond to the award of counsel fees. It, however, was not a "liquid asset" although by our disposition of this appeal, the sale of the family home hereinafter ordered will yield liquid assets for both parties. Under the circumstances, the award of counsel fees to the plaintiff constituted error.

There is no error in the judgment dated January 19, 1981; there is error in the supplementary judgment of December 29, 1981. The supplementary judgment is set aside with respect to counsel fees only. The case is remanded with direction to set a new date for the sale of the family home and to vacate the award of attorney's fees.

In this opinion PETERS, PARSKEY and F. HENNESSY, Js., concurred.

---

[19] The court's conclusion there stated: "Under the facts presented in this case there is no basis for the award of counsel fees. *Murphy* v. *Murphy*, 180 Conn. 376, 381, 429 A.2d 897 (1980)."

SHEA, J. (dissenting). I disagree with the conclusion of the majority that the findings related to the earning capacity of the defendant wife and her opportunities for future acquisition of capital assets are adequately supported by the evidence.

The inappropriateness of the hyperbole, "nationally celebrated harpist," as applied to the defendant or any other virtuoso of that instrument of recent memory is of small concern. Of more serious import is the assumption of the majority that after twenty years of inactivity as a professional musician during the marriage the defendant has a realistic prospect of supporting herself in a changed musical world where a harp has become a curiosity. In *Schmidt* v. *Schmidt,* 180 Conn. 184, 190, 429 A.2d 470 (1980), we held that evidence of the specific amount of income which could be earned was necessary in order to support an award of alimony and support based upon a husband's earning capacity as a commodities broker. The record in this case is wholly devoid of any evidence of the potential earnings of the defendant if she were to "carry on with her music." The attempt by the majority to distinguish *Schmidt* on the ground that there the husband had been ordered to pay fixed weekly amounts seems to imply that speculation rather than the normal standard of proof is permissible when our only concern is with the ability of a wife to meet her living expenses.

The conclusion of the majority that the finding of a "possibility of future acquisition of capital assets" by the wife can be based upon contributions of her mother and her brother to her support is also at variance with our precedents. In *Schmidt* v. *Schmidt,* supra, 188, we held that gratuities received in the past did not constitute a dependable source of funds upon which the court could rely. In *Krause* v. *Krause,* 174 Conn. 361, 365, 387 A.2d 548 (1978), evidence of the potential inheri-

tance of a wife was ruled inadmissible because such an expectancy is merely a "bare hope" having "no attribute of property." Since evidence of former gratuities is an even flimsier basis for finding a likelihood of the future acquisition of capital assets than proof of an expectancy, the distinction drawn by the majority between the two situations is wholly formalistic.

The fact that the judgment awarded the defendant 60 percent of the net proceeds of the sale of the residence, as compared with 40 percent to her husband, indicates that the trial court may not have relied greatly upon the findings which I regard as erroneous. The difference in the respective shares which the parties are to receive upon sale of the property would be at least $20,000 according to the finding of the trial court that their joint equity exceeded $100,000. This disparity may well have been intended as a substitute for periodic alimony to the wife during the remaining working life of the husband, who was sixty-eight at the time of trial and earned $262 per week after deductions. As such it seems quite reasonable under the circumstances. Nevertheless, it is not possible to ignore erroneous findings made by a trial court which may have influenced the final result. See *McPhee* v. *McPhee,* 186 Conn. 167, 177, 440 A.2d 274 (1982). We cannot be certain that the award would not have been more generous to the defendant in the absence of these disputed findings. Accordingly, I would find error and order a new trial.