******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************************

LAUREN T. SEDER *v.* ROBERT M. ERRATO
(AC 43379)

Cradle, Alexander and Eveleigh, Js.

*Syllabus*

The defendant appealed from the judgment of the trial court dissolving his marriage to the plaintiff. During the dissolution proceedings, the defendant claimed that the parties had entered into a prenuptial agreement but that the agreement was missing. The court held an evidentiary hearing to permit the defendant to attempt to prove the existence and terms of that agreement by offering collateral evidence as to its contents. The defendant attempted to introduce as a proposed exhibit a boilerplate prenuptial agreement that had been downloaded from an online publisher of legal documents in order to prove the content of the parties' alleged agreement. The document had several areas that were not populated and there were no financial disclosures attached. The plaintiff testified that she had signed a prenuptial agreement but that the defendant had not signed it, and she had no clear recollection as to what the terms might have been or what the defendant's financial disclosures may have included. The court found that, although there was a premarital agreement that was signed prior to the date of the marriage, there was a lack of evidence as to the terms of the agreement, and concluded that the proposed exhibit would not be allowed into evidence. Following a trial, the court ordered the defendant to contribute to the plaintiff's legal fees and costs. On the defendant's appeal to this court, *held*:

1. The trial court did not err in failing to enforce the alleged prenuptial agreement, the evidence having amply supported the court's finding that the defendant did not sufficiently establish the contents of the agreement: although the defendant presented some evidence to prove the contents of the alleged missing agreement, including the proposed exhibit, the court found that no specific date of the agreement had been proven and there was a conflict with the nature and depth of the financial disclosures; moreover, contrary to the defendant's claim, the court did not impermissibly favor the plaintiff's lack of memory of the terms of the alleged agreement or completely overlook the evidence the defendant proffered, the defendant having failed to appreciate that it was within the province of the court, when sitting as the fact finder, to weigh the evidence presented and determine its credibility and effect, and the court found the plaintiff's testimony generally credible throughout the trial and significant portions of the defendant's testimony to be not credible; accordingly, this court, deferring to the trial court's assessments concerning credibility, determined that the trial court did not abuse its discretion in excluding the defendant's proposed exhibit.

2. There was no merit to the defendant's claim that the trial court erred in awarding attorney's fees to the plaintiff: the court methodically analyzed the plaintiff's purported justifications for entitlement to attorney's fees and determined that an award of attorney's fees was warranted pursuant to the applicable statute (§ 46b-62 (a)) for payment of attorney's fees in dissolution proceedings; moreover, there was no support in the record for the defendant's claim that the court abused its discretion in awarding attorney's fees in the amount of $280,000.

Argued January 5—officially released March 15, 2022

*Procedural History*

Action for the dissolution of a marriage, and for other relief, brought to the Superior Court in the judicial district of Hartford where the defendant filed a counterclaim; thereafter, the matter was tried to the court, *Hon. Gerard I. Adelman*, judge trial referee; judgment dissolving the marriage and granting certain other relief, from which the defendant appealed to this court; subsequently, the court, *Hon. Gerard I. Adelman*, judge trial

referee, granted the plaintiff's motion for attorney's fees, and the defendant filed an amended appeal. *Affirmed.*

*Daniel J. Krisch*, for the appellant (defendant).

*Michael S. Taylor*, with whom were *Brendon P. Levesque*, and, on the brief, *Scott T. Garosshen*, for the appellee (plaintiff).

*Opinion*

EVELEIGH, J. In this dissolution of marriage action, the defendant, Robert M. Errato, appeals from the judgment of the trial court dissolving his marriage to the plaintiff, Lauren T. Seder, and challenges the trial court's financial orders and award of attorney's fees. On appeal, the defendant claims that the court improperly (1) refused to enforce the parties' prenuptial agreement and (2) ordered the defendant to pay $280,000 in attorney's fees. We affirm the judgment of the trial court.

The following facts and procedural history are relevant to this appeal. The parties first met in October, 1998, at the Oakdale Theater in Wallingford, which was operated by the defendant. On October 10, 2003, the parties were married in Fort Meyers, Florida. This was each party's third marriage. Their marriage was good for the first few years, but a breakdown of the relationship began around 2007 or 2008. By the spring of 2014, the plaintiff came to believe that the marriage was beyond saving. The parties discussed and negotiated their separation in 2014, but that process was not successful. Collaboration eventually gave way to litigation.

The present dissolution action was filed by the plaintiff on May 12, 2015. The parties continued to discuss amicable terms to resolve the divorce and took no action to further their respective cases until the fall of 2015. On October 2, 2015, the plaintiff filed a motion for alimony pendente lite, which was later granted by the court. The dissolution trial was then held over nineteen days between May 1, 2017, and June 26, 2019. There was also a multiday hearing on the defendant's motion to modify alimony pendente lite in the middle of trial, which resulted in testimony and other legal proceedings covering a total of twenty-three days.

In a memorandum of decision dated August 29, 2019, the court dissolved the parties' marriage and ordered the defendant, among other things, to pay the plaintiff periodic monthly alimony in the amount of $2500 and a lump sum alimony payment in the amount of $450,000. The court also ordered the defendant to contribute to the plaintiff's legal fees and costs in the amount of $250,000. This appeal followed.

The plaintiff subsequently moved for an award of appellate attorney's fees. On December 4, 2019, the defendant filed his opposition thereto. On December 16, 2019, the trial court ordered the defendant to contribute an additional $30,000 to the plaintiff's legal fees for her defense of this appeal, finding that the plaintiff lacked access to liquid funds to pay for her own legal fees. Thereafter, the defendant filed an amended appeal. Additional facts and procedural history will be set forth as necessary.

I

The defendant first claims that the trial court improperly refused to enforce the parties' prenuptial agreement and argues that undisputed testimony and documents established the terms of that agreement. The plaintiff, on the other hand, takes exception to the characterization of the defendant's claim. She argues that although the defendant suggests that the trial court erred in refusing to enforce the alleged prenuptial agreement, the court never reached enforcement because the court properly concluded that there were no terms of an agreement or any associated financial disclosures that it could construe, much less enforce. We agree with the plaintiff.[1]

In its memorandum of decision, the court set forth the following factual background: "The parties both testified that they agreed to have a prenuptial agreement. The defendant testified that the couple started discussing a prenuptial agreement as early as August of 2003. He claims that it was the plaintiff's idea to have such an agreement and that they both agreed that they would not marry without one. The defendant testified that at the time of the marriage, in the fall of 2003, he had assets in excess of ten million dollars . . . . Surprisingly, despite the defendant's wealth and dealings with many lawyers through his different business ventures, he testified that he downloaded a generic prenuptial agreement from the Internet and filled it out himself. The evidence is somewhat contradictory on this issue. At one point, the defendant claimed that the plaintiff did the first draft of the agreement, but now testified that he did it as a proactive move. Regardless, by early October of 2003, there was an agreement in draft.

"The plaintiff testified that she prepared a financial disclosure as part of the process and gave the one . . . page form to the defendant. She agreed that the defendant did some type of financial disclosure as well, and it might have been on the same one . . . page form that she had used. When questioned by the plaintiff's counsel about the nature of the defendant's financial disclosures to the plaintiff, the defendant was rather unsure of what was specifically included in his disclosure. He did admit that he had not updated the value of those assets prior to the agreement being finalized. The defendant did state that his ten million dollars . . . was more like ten million, four hundred thousand, to ten million, five hundred thousand dollars . . . by the first few days of October of 2003. He could not, with any assurance, recall if he had disclosed all of his various bank accounts and their balances, or if he had disclosed his capital gains income or not. The defendant likewise could not offer an opinion as to whether or not such a disclosure was of value and should have been included on his financial disclosure to the plaintiff.

"The defendant did show a draft prenuptial agreement to Attorney Thomas Benneche who had done

work for the defendant on some of the Oakdale Theater issues and other business matters throughout the 1990s. Attorney Benneche, who practiced primarily real estate law, testified that he had met with his client on another matter, and at the end of the meeting, the defendant asked him to look over the agreement. Benneche obliged his client. He made a copy of the draft to use for the discussion. He told the defendant that there were no disclosures attached to the draft and that was a problem. He also suggested to him that he should make some other changes. Benneche testified that he never saw an executed agreement, never saw a revised draft of the agreement, never saw any of the financial disclosures and never spoke to the plaintiff about the agreement again until this litigation commenced. The attorney also admitted that he had no knowledge of the financial disclosure that had been made by the defendant including any of the defendant's pending lawsuits and any estimated value of any recovery as a result of such lawsuits. Benneche also testified that he did not take anyone's acknowledgement on the prenuptial agreement and that he cannot find the copy he made when the defendant was in his office in 2003 some sixteen . . . years earlier.

"The plaintiff testified that she signed the agreement, but at that time the defendant had not signed it. She claims that she gave duplicate originals to the defendant, but after that, she never saw an executed copy, nor did she ever receive an executed agreement or copy. It was only years later, once marital difficulties had arisen, that she asked the defendant for a copy of the agreement. She testified that she has no clear recollection as to what the terms might have been or what the defendant's financial disclosures might have included. It was her testimony that although they were living together informally prior to the marriage and she had some idea of the defendant's business ventures from general conversation, he was a very private person about his affairs. She knew he had a lot of money, more than she had, and that they were living well. The defendant also testified that he did not have a copy of a signed agreement." Therefore, no signed agreement was ever presented to the court.

The court explained that "[t]he defendant attempted to offer collateral evidence as to the content of the prenuptial agreement by way of a proposed defendant's exhibit 'C.' The plaintiff filed a motion in limine to preclude such an exhibit . . . . The court ruled that it would hold an evidentiary hearing on the issue. That hearing took place on January 16, 2019. After the hearing, the court granted the plaintiff's motion in limine and precluded the defendant's proposed exhibit. The same was marked as the defendant's exhibit 'C,' for identification only."[2]

The plaintiff's motion in limine to preclude the defen-

dant's proposed exhibit, which was referenced by the court in its memorandum of decision, was filed on July 17, 2018. The plaintiff argued that the defendant's proposed exhibit K (later marked as exhibit C)[3] was not an executed or enforceable prenuptial agreement, but rather appeared to be an attempt to "populate" a boilerplate prenuptial agreement document. She argued that proposed exhibit K—an unfinished, unsigned and undated document—should not be introduced into the trial as evidence because it was not relevant. At the preliminary hearing on the plaintiff's motion on July 19, 2018, the plaintiff's counsel argued that the defendant could not proceed on his claim for enforcement of a prenuptial agreement because no written, signed agreement existed. In an attempt to provide the defendant with "the fairest possible trial of all the issues," the court held an evidentiary hearing based on the defendant's claim that he could prove the existence and terms of the alleged missing premarital agreement with other collateral evidence.

At the conclusion of the evidentiary hearing on the motion to preclude the defendant's proposed exhibit, the court observed that "it's clear that the Connecticut law, both statutory and common law, allows a party to prove the existence and terms of a contract by parol evidence if that contract is lost, stolen or destroyed. Our Uniform Commercial Code provides for such a procedure. As has been introduced, our Connecticut Code of Evidence § 10-3 provides for it as well." The court then found that, although "[t]here was a premarital agreement" that "was signed prior to the date of the marriage," there was "a lack of evidence as to the terms of the agreement." The court stated: "The defendant has offered several forms, which he testified he used, and the plaintiff agrees that she signed an agreement, but the court has heard no testimony from the plaintiff as to what those terms were." The court then stated that "[t]he credibility of each parties' testimony has been found wanting by the court. For two such people, one a very successful businessman and the other an attorney, to rely on an online form for such an important matter is really quite incredible. It appears to the court that neither party gave this agreement any serious consideration or thought. This is not the first marriage for either party. The defendant, by all accounts, was a wealthy person with children from a previous marriage to protect. The plaintiff also is a mother of children from a previous marriage. And yet neither sought any professional advice from an experienced matrimonial attorney. The plaintiff sought none at all, and the defendant asked a commercial and real estate lawyer for a quick look-see, done as a favor without a fee for their client." The court found that "even addressing the facts in the best light to support the defendant, [*the court*] *cannot find by a preponderance of the evidence that it knows the terms of the agreement* . . . ." (Emphasis

added.)

In addition to concluding that the defendant failed sufficiently to prove the terms of the allegedly lost prenuptial agreement and, thus, that a valid prenuptial agreement did not exist, the court also found that a valid agreement did not exist because no specific date of the alleged agreement had been proven and because there was a "conflict as to the nature and depth of [financial] disclosures." Accordingly, the court concluded that "[e]xhibit C, formerly known as K, will not be allowed into evidence. The defendant's exhibits previously allowed in during the evidentiary hearing will now be reclassified as ID only to preserve the record."

In the present appeal, the parties disagree as to the standard of review applicable to the defendant's claim. The defendant argues that our standard of review in this case is plenary because the enforceability of a prenuptial agreement presents a mixed question of fact and law. The plaintiff disagrees and argues that an abuse of discretion standard of review is applicable here because a trial court's ruling as to whether evidence is relevant and probative is subject to review for abuse of discretion. We agree with the plaintiff.

In reviewing the court's findings and conclusions with respect to the alleged prenuptial agreement, the trial court never reached the question of, or conducted a hearing on, the enforceability of the purported agreement. This is because the trial court made clear that there existed no valid prenuptial agreement for which it knew the terms. To be sure, in addressing one of the defendant's claims regarding the allocation of marital property, the court stated: "The court, ruling that there is no valid prenuptial agreement, eliminates such a claim by the defendant . . . ." As previously set forth, the court's conclusion rested on three separate grounds: (1) there was "a lack of evidence as to the terms of the agreement," (2) the defendant failed to prove a specific date of the alleged agreement, and (3) the defendant failed to prove the nature and depth of the financial disclosures. On those bases, the court precluded the defendant from introducing exhibit C (formerly exhibit K) into the dissolution proceedings.

Because the court did not reach the question of enforcement, we interpret the defendant as challenging the bases for the court's decision to exclude exhibit C—the unsigned, undated, and unfinished boilerplate prenuptial agreement document—from the dissolution proceedings. As is well known, "[t]he trial court's ruling on the admissibility of evidence is entitled to great deference. . . . [T]he trial court has broad discretion in ruling on the admissibility . . . of evidence . . . [and its] ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion." (Internal quotation marks omitted.) *Brown* v. *Brown*, 130 Conn. App. 522, 531, 24 A.3d

1261 (2011).

With this standard in mind, we turn our attention to the court's principal basis for excluding exhibit C from the general dissolution proceedings—namely, that the document presented was not relevant because the defendant failed to sufficiently prove the terms of the allegedly lost or missing prenuptial agreement. The defendant assigns error to this finding because, in his view, there was undisputed testimony and documents to establish the terms of the agreement. The defendant is arguing essentially that the court abused its discretion in excluding the proposed exhibit because the court's finding that he did not sufficiently prove the contents of the alleged missing prenuptial agreement through secondary evidence is clearly erroneous. See, e.g., *Host America Corp.* v. *Ramsey*, 107 Conn. App. 849, 855, 947 A.2d 957 ("[t]he plaintiff first claims that the court abused its discretion in denying its application for injunctive relief because the court's finding that the defendants proved the former existence, present unavailability and contents of the defendants' employment agreements through secondary evidence is clearly erroneous"), cert. denied, 289 Conn. 904, 957 A.2d 870 (2008).

"The factual findings of a trial court must stand . . . unless they are clearly erroneous or involve an abuse of discretion." (Internal quotation marks omitted.) *Hammel* v. *Hammel*, 158 Conn. App. 827, 832, 120 A.3d 1259 (2015). "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Because it is the trial court's function to weigh the evidence and determine credibility, we give great deference to its findings. . . . In reviewing factual findings, [w]e do not examine the record to determine whether the [court] could have reached a conclusion other than the one reached. . . . Instead, we make every reasonable presumption . . . in favor of the trial court's ruling." (Internal quotation marks omitted.) Id., 832–33.

Section 10-3 of the Connecticut Code of Evidence provides four instances in which secondary evidence may be introduced to establish the contents of a document: (1) when the originals are lost or destroyed, (2) when the originals are not obtainable by any reasonably available judicial process or procedure, (3) when the originals are in the possession or control of the opponent, or (4) when the contents relate to a collateral matter. Conn. Code Evid. § 10-3. "The cases and the commentaries are . . . in substantial agreement that a party must undertake a twofold burden in order to recover on a document that he cannot produce. Such a party must demonstrate both (a) the former existence

and the present unavailability of the missing document, and (b) the contents of the missing document." *Connecticut Bank & Trust Co.* v. *Wilcox*, 201 Conn. 570, 573, 518 A.2d 928 (1986).

Our careful review of the record reveals that the court did not err in finding that the defendant failed to prove the contents of the alleged missing prenuptial agreement. The defendant did, as he claims, present some testimony from himself and Benneche about the alleged prenuptial agreement and its terms. In particular, he introduced certain form prenuptial agreements, such as exhibit C, which he downloaded from U.S. Legal Forms, an online publisher of legal documents, in an attempt to prove the contents of the alleged agreement. He testified that he made only minor changes to the document prior to giving it to the plaintiff. He acknowledged, however, that the form had certain areas that were not populated. He thus testified to the areas he populated prior to giving the document to the plaintiff. He further acknowledged that exhibit C did not have financial disclosures attached to it but testified that the final agreement did have some type of asset distribution with the last version.[4]

Benneche also testified that he did review a draft of a prenuptial agreement with the defendant and had a recollection of some but not all of the pages of the presented form document. He testified, however, that he never saw the financial disclosures that allegedly accompanied the document or a copy of an executed prenuptial agreement between the parties. Benneche also indicated that he never witnessed the parties sign the document.

Although the defendant did present some evidence to prove the contents of the alleged missing agreement, we disagree with the defendant's contention that the court impermissibly favored the plaintiff's lack of memory of the terms of the alleged prenuptial agreement and completely overlooked the evidence he proffered of the contents of the alleged prenuptial agreement. The defendant fails to appreciate "that [i]t is within the province of the trial court, when sitting as the fact finder, to weigh the evidence presented and determine the credibility and effect to be given the evidence." (Internal quotation marks omitted.) *Ravetto* v. *Triton Thalassic Technologies, Inc.*, 285 Conn. 716, 728, 941 A.2d 309 (2008). In the court's memorandum of decision, it found that the plaintiff's testimony was "generally credible throughout the trial," and explicitly stated that "[t]he court finds significant portions of the defendant's testimony not to be credible, including but not limited to his description of the plaintiff's behavior during his period of depression and his allegations of fraud raised against the plaintiff . . . ."

The court also explicitly stated at the conclusion of the evidentiary hearing on the motion in limine regard-

ing the proposed exhibit that "[t]he credibility of each parties' testimony [had] been found wanting by the court." This includes the testimony of the defendant. The court further found incredible that the defendant, "a very successful businessman," and the plaintiff, an attorney, would "rely on an online form for such an important matter . . . ." The court was permitted, in its role as fact finder, to determine what weight, if any, to give the testimony presented by the defendant. It is clear little weight was given. Deferring, as we must, to the trial court's assessments concerning credibility, we have little difficulty concluding that the evidence amply supported the trial court's finding that the defendant did not sufficiently establish the terms of the alleged missing prenuptial agreement. See *D. S.* v. *R. S.*, 199 Conn. App. 11, 18, 234 A.3d 1150 (2020) ("[a]n appellate court must defer to the trier of fact's assessment of credibility because [i]t is the [fact finder] . . . [who has] an opportunity to observe the demeanor of the witnesses and the parties; thus [the fact finder] is best able to judge the credibility of the witnesses and to draw necessary inferences therefrom" (internal quotation marks omitted)). We therefore cannot conclude that the court abused its discretion in excluding the defendant's proposed exhibit, and, consequently, did not err in failing to enforce the alleged prenuptial agreement.[5]

## II

We turn next to the decision of the court ordering the defendant to contribute $280,000 toward the plaintiff's attorney's fees. The American rule, followed by Connecticut, generally requires that each party compensate his or her own lawyers. See, e.g., *Mangiante* v. *Niemiec*, 98 Conn. App. 567, 570, 910 A.2d 235 (2006). This rule, like almost every general rule, admits of various exceptions. See, e.g., *Lederle* v. *Spivey*, 332 Conn. 837, 843–44, 213 A.3d 481 (2019); *Ramin* v. *Ramin*, 281 Conn. 324, 351, 915 A.2d 790 (2007).

One such exception to the American rule is when the imposition of attorney's fees is permitted by statute. For example, General Statutes § 46b-62 (a) authorizes a trial court to award attorney's fees in a dissolution proceeding when appropriate in light of the "respective financial abilities" of the parties and the equitable factors listed in General Statutes § 46b-82. Our Supreme Court has set forth "three broad principles by which these statutory criteria are to be applied. First, such awards should not be made merely because the obligor has demonstrated an ability to pay. Second, where both parties are financially able to pay their own fees and expenses, they should be permitted to do so. Third, where, because of other orders, the potential obligee has ample liquid funds, an allowance of [attorney's] fees is not justified." (Internal quotation marks omitted.) *Hornung* v. *Hornung*, 323 Conn. 144, 169–70, 146 A.3d

912 (2016).

"A determination of what constitutes ample liquid funds . . . requires . . . an examination of the total assets of the parties at the time the award is made. . . . *Anderson* v. *Anderson*, 191 Conn. 46, 59, 463 A.2d 578 (1983). We have recognized, however, that [t]he availability of sufficient cash to pay one's attorney's fees is not an absolute litmus test . . . . [A] trial court's discretion should be guided so that its decision regarding attorney's fees does not undermine its purpose in making any other financial award. *Devino* v. *Devino*, 190 Conn. 36, 38–39, 458 A.2d 692 (1983); see also, e.g., *Grimm* v. *Grimm*, 276 Conn. 377, 398, 886 A.2d 391 (2005) (not awarding $100,000 in attorney's fees to wife would have necessarily eviscerate[d] any benefit she would have received from $100,000 lump sum alimony award), cert. denied, 547 U.S. 1148, 126 S. Ct. 2296, 164 L. Ed. 2d 815 (2006)." (Internal quotation marks omitted.) *Hornung* v. *Hornung*, supra, 323 Conn. 170.

"Whether to allow counsel fees . . . and if so in what amount, calls for the exercise of judicial discretion. . . . An abuse of discretion in granting counsel fees will be found only if [an appellate court] determines that the trial court could not reasonably have concluded as it did." (Internal quotation marks omitted.) *Giordano* v. *Giordano*, 203 Conn. App. 652, 661, 249 A.3d 363 (2021).

In the present appeal, the defendant argues that the court improperly ordered him to pay the plaintiff $280,000 toward her attorney's fees. He claims that the court (1) abused its discretion in awarding the fees under § 46b-62 because the plaintiff has sufficient funds from which to pay her attorneys, (2) improperly ordered the attorney's fees because the court awarded the fees for two acts of litigation misconduct despite finding that one of the two had a "colorable theory," and (3) improperly "awarded $250,000 for the plaintiff's trial counsel fees despite it being certainly beyond the court's ability to fully understand the amount of the preparation time expended by the plaintiff's counsel in defending against the litigation misconduct." (Internal quotation marks omitted.) We disagree with the defendant. Because we conclude that the court's award of attorney's fees was proper in accordance with § 46b-62, we need not reach the defendant's additional two claims that relate to the court's second independent basis for awarding attorney's fees, to wit, that the defendant engaged in litigation misconduct.

The following additional facts help inform our discussion. The plaintiff incurred nearly $560,000 in legal fees related to all aspects of the trial court case. The retainer fee for the appeal added another $40,000, bringing her total legal fees to nearly $600,000. The plaintiff's most recent financial affidavit dated May 2, 2019, showed total assets of $552,110, of which more than 50 percent

of those assets are in deferred income retirement funds. Only approximately $151,732 is held in liquid assets. The defendant's most recent financial affidavit discloses that he owns assets totaling $973,258. The court found, however, that many of those assets are undervalued by the defendant. Nevertheless, the court stated that "looking only at his liquid, noncontroversial holdings, they total almost . . . $850,000."

In the court's memorandum of decision, the court methodically went through the plaintiff's purported justifications for entitlement to attorney's fees, addressing the plaintiff's arguments that counsel fees were appropriate pursuant to § 46b-62 (a), *Ramin* v. *Ramin*, supra, 281 Conn. 324, and *Maris* v. *McGrath*, 269 Conn. 834, 835, 850 A.2d 133 (2004). After a thorough analysis, the court concluded that an award of counsel fees based on discovery misconduct, as discussed in *Ramin*, was not appropriate. The court, however, determined that an award of legal fees was warranted under two separate, independent bases—pursuant to § 46b-62 (a) and because of the defendant's litigation misconduct. Accordingly, the court ordered the defendant to contribute $250,000 toward the plaintiff's legal fees. After considering the plaintiff's motion for appellate fees and the defendant's opposition thereto, the court ordered the defendant to contribute an additional $30,000 to the plaintiff's legal fees for her defense of this appeal.

In the present case, we find no support in the record for the defendant's claim that the court abused its discretion in making the award of counsel fees that it did. The defendant argues in a rather conclusory manner that "the plaintiff has the resources to pay her attorneys" and cites to various cases that are easily distinguishable from the present case. One such case is *Hornung* v. *Hornung*, supra, 323 Conn. 144. As this court observed: "In *Hornung*, the court awarded the plaintiff $100,000 in trial attorney's fees and $40,000 in appellate attorney's fees. . . . The defendant claimed on appeal that 'the plaintiff received ample liquid funds from the trial court's judgment with which to pay her attorney's fees, and that the trial court's conclusion that not awarding her attorney's fees would undermine its other awards to her was unreasonable.' . . . Our Supreme Court agreed with the defendant. It first considered that the trial attorney's fees award 'represent[ed] a very small portion of the liquid assets awarded to the plaintiff in the trial court's judgment.' . . . Specifically, [the] court noted that 'the plaintiff [was to] receive liquid assets totaling $2,577,000 within three months of the judgment' and that the fee award 'represent[ed] only 4 percent of this amount.' . . . The plaintiff was to receive '$2,082,000, the amount owed to her under the [parties' prenuptial] agreement, within sixty days of the judgment; $40,000 per month in periodic alimony and child support, starting twelve days from the judgment; and $7.5 million in lump sum alimony, payable in bian-

nual installments of $375,000, starting two and one-half months from the judgment.' . . . [Our] Supreme Court concluded that, 'given the vast liquid assets awarded to the plaintiff, and the modest nature of the attorney's fees when compared with those assets, the equitable factors in § 46b-82, as incorporated into § 46b-62, do not justify the award.' " (Citations omitted.) *Anketell* v. *Kulldorff*, 207 Conn. App. 807, 840–41, 263 A.3d 972, cert. denied, 340 Conn. 905, 263 A.3d 821 (2021).

This is not such a case. As the plaintiff correctly notes, $280,000 is 185 percent of the plaintiff's liquid assets. The defendant does not challenge the court's liquid asset finding as clearly erroneous, but instead resorts to generalized arguments that "the plaintiff has sufficient assets to pay her attorneys." Even if one were to add the $450,000 lump sum alimony award (which the plaintiff did not have access to because the trial court denied her motion to lift the automatic stay) to the amount of the plaintiff's liquid assets, the counsel fee award is still 47 percent of that total. See *Hornung* v. *Hornung*, supra, 323 Conn. 176 ("attorney's fees awards reflecting a more significant portion of the payee's lump sum alimony award, thereby potentially undermining that award, have been held proper, especially when equitable factors support the award"); see also *Costa* v. *Costa*, 11 Conn. App. 74, 75–78, 526 A.2d 4 (1987) (attorney's fees award of $6000, amounting to 30 percent of $20,000 lump sum alimony award, not including periodic alimony award, was not abuse of discretion where husband had $280,000 in assets, wife had $170,000 in assets, and husband earned $58,400 per year).

The claim of error raised by the defendant, that the trial court erred in awarding the plaintiff $280,000 in attorney's fees, is without merit. "An abuse of discretion in granting [attorney's] fees will be found only if [an appellate court] determines that the trial court could not reasonably have concluded as it did." (Internal quotation marks omitted.) *Misthopoulos* v. *Misthopoulos*, 297 Conn. 358, 386, 999 A.2d 721 (2010). Having thoroughly examined the record, we cannot so hold.[6]

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The plaintiff also argues that the appeal is moot with respect to the alleged prenuptial agreement because the defendant fails to challenge the trial court's striking of count one of his counterclaim, which pleaded the existence of a prenuptial agreement, and that his briefing on appeal is inadequate. We disagree. Although the defendant does not explicitly state that he is challenging the court's motion to strike, it is clear that in challenging the judgment of dissolution and financial orders generally, he specifically takes exception to the court's finding that a valid prenuptial agreement did not exist. That is precisely the basis on which the motion to strike was granted, and the defendant briefs all three independent bases on which the court's decision is predicated. See *Leonova* v. *Leonov*, 201 Conn. App. 285, 314–15, 242 A.3d 713 (2000) ("although precedent establishes that an appeal or claim of error can be rendered moot if the appellant neglects to challenge every independent ground on which the challenged ruling may be sustained, the defendant here has challenged both findings on which the finding of

contempt was predicated"), cert. denied, 336 Conn. 906, 244 A.3d 146 (2021). The defendant provides adequate analysis, legal support, and relevant citations to the record for our review of his claim on the merits. Accordingly, we conclude that the defendant's claim is neither moot nor inadequately briefed.

[2] The court explained: "As with other issues in this case, the matter of the alleged prenuptial agreement had been litigated more than once prior to the court's ruling as to defendant's exhibit 'C,' for identification only. Judge Albis granted a motion to strike regarding the alleged agreement on March 31, 2016 . . . . This court ordered the defendant not to ask questions about the alleged agreement in a deposition on September 8, 2016 . . . . Judge Simon refused to allow the defendant to plead the alleged agreement on October 12, 2016 . . . and Judge Nastri's orders regarding the plaintiff's motion to strike the defendant's special defenses regarding the prenuptial agreement issued on August 29, 2017 . . . . All the above referenced rulings prohibited the pleading of the prenuptial agreement except for the last ruling which allowed its pleading as a defense only to allegations of fraudulent conveyances by the defendant to his adult sons."

[3] For clarification purposes, during the evidentiary hearing that was held regarding the alleged lost prenuptial agreement, defendant's proposed exhibit K was marked as exhibit C and admitted as a full exhibit for purposes of that hearing only. Following that hearing, the court reclassified and referred to that exhibit as exhibit C for identification only. Thus, proposed exhibit K and exhibit C are the same document.

[4] When asked whether the last version contained an asset distribution, the defendant responded in the affirmative but stated: "Well, not necessarily attached."

[5] Because we conclude that exclusion of the defendant's proposed exhibit was proper on this basis, we need not reach the other two independent bases the court set forth for exclusion of the document.

[6] We note that, even if the plaintiff did have ample liquid funds to pay for her own counsel fees, the court's award of counsel fees would still be justified because the record supports the conclusion that the failure to make such an award would undermine the court's previous orders. See *Grimm* v. *Grimm*, supra, 276 Conn. 397 ("[A]n award of attorney's fees is justified even where both parties are financially able to pay their own fees if the failure to make an award would undermine its prior financial orders . . . . The trial court need not make an express finding with respect to whether the fee award is necessary to avoid undermining the other financial orders, so long as the record supports that conclusion." (Citations omitted; internal quotation marks omitted.)).